[No. B200673. Second Dist., Div. Four. Dec. 17, 2009.]

PLANNING AND CONSERVATION LEAGUE et al., Plaintiffs and Appellants, v.
CASTAIC LAKE WATER AGENCY, Defendant and Appellant;
KERN COUNTY WATER AGENCY et al., Real Parties in Interest and Appellants;
CALIFORNIA DEPARTMENT OF WATER RESOURCES, Real Party in Interest and Respondent.

214

COUNSEL

Rossmann and Moore, Antonio Rossmann, Roger B. Moore, Jennifer Seidenberg; Law Offices of Babak Naficy and Babak Naficy for Plaintiffs and Appellants.

Eisenberg and Hancock, William N. Hancock, Jon B. Eisenberg; McCormick, Kidman & Behrens, Russell G. Behrens, David D. Boyer; Remy, Thomas, Moose and Manley, James G. Moose and Laura M. Harris for Defendant and Appellant.

Kronick, Moskovitz, Tiedemann & Girard Clifford W. Schulz; and Amelia T. Minaberrigarai for Real Party in Interest and Appellant Kern County Water Agency.

The Law Offices of Young Wooldridge, Ernest A. Conant and Steven M. Torigiani for Real Party in Interest and Appellant Wheeler Ridge-Maricopa Water Storage District.

Edmund G. Brown, Jr., Attorney General, Janet Gaard, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, Marilyn H. Levin and Deborah A. Wordham, Deputy Attorneys General, for Real Party in Interest and Respondent.

## OPINION

**MANELLA, J.**—Planning and Conservation League (PCL) and California Water Impact Network (CWIN) sought administrative mandamus (Code Civ. Proc., § 1094.5) in actions involving Castaic Lake Water Agency (Castaic). Their petitions challenged an environmental impact report (EIR) certified by

Castaic pursuant to the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) concerning a transfer of water from Kern County Water Agency (Kern) and Wheeler Ridge-Maricopa Water Storage District (Wheeler Ridge) to Castaic. Although the trial court rejected PCL's and CWIN's key contentions, it found that the EIR contained a defect, and issued a writ of mandate directing Castaic to decertify the EIR. PCL and CWIN appealed, challenging the trial court's rejection of their contentions; Castaic, Wheeler Ridge, and Kern cross-appealed, challenging the issuance of the writ. We conclude that the trial court correctly rejected PCL and CWIN's principal contentions, but erred in issuing the writ. We thus reverse.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The underlying actions culminate long-standing disputes concerning the water transfer in question, which arises within California's State Water Project (SWP). This is the third time we have addressed issues related to Castaic's attempt to certify an EIR concerning the transfer in compliance with CEQA. We summarize the history preceding our first two opinions before describing the facts pertinent to the present appeal.

### A. *SWP*

California's Department of Water Resources (DWR) manages the SWP, a system of dams, reservoirs, canals, and aqueducts that delivers water from the so-called "Delta" area of the Sacramento River to Central and Southern California. The SWP, as planned, was to deliver 4.23 million acre-feet of water annually.[1] Because the SWP has not been completed, it delivers an average of 2.96 million acre-feet per year.

In 1961, DWR entered into contracts for the provision of water to local suppliers. At present, 29 local suppliers have contracts with the DWR, including Castaic and Kern. The contracts have standardized provisions. Each contract identifies a maximum amount of water—often called the "Table A water"—that DWR has agreed to provide to the contractor, if the water is available. Delivery of the full amount of Table A water is not assured.

As initially executed, the contracts addressed shortages in article 18. In the case of a temporary shortage, article 18(a) imposed reductions first on contractors supplying water for agricultural purposes; in the case of a permanent shortage, article 18(b) imposed a prorated reduction on each contractor through amendment of the Table A water amount stated in the contract.

---

[1] An acre-foot is the quantity of water that would cover an acre of land to a depth of one foot.

### B. *Monterey Agreement*

Historically, DWR has delivered less water than the total amount of Table A water identified in the contracts. Until the late 1980's, the shortfall caused few problems because the contractors did not demand their full allocation of Table A water. In the late 1980's and early 1990's, a drought reduced DWR's deliveries below the amounts requested by the contractors, resulting in reductions to contractors supplying water for agricultural purposes. Disputes arose between these contractors and contractors providing water for urban areas.

In December 1994, the DWR and five contractors met in Monterey and negotiated 14 broad principles regarding amendment of the contracts. The so-called "Monterey Agreement" approved amendments that changed the allocations of water to agricultural and urban suppliers. The contracts were to be amended to eliminate the water reduction provisions in article 18—including the "agriculture first" provision in article 18(a)—and to provide instead that each supplier was entitled to a prorated portion of the available water, based on its Table A amount, regardless of whether the water was used for agricultural or urban purposes. In addition, the permitted amendments freed 130,000 acre-feet of water previously allocated to agricultural use for transfer to urban suppliers. DWR agreed to "expeditiously approve permanent sales of entitlements among [c]ontractors."

In 1995, the Central Coast Water Authority (Central Coast), one of the 29 contractors, prepared and certified an EIR under CEQA regarding the Monterey Agreement. Over the following two years, 27 of the 29 contractors—including Castaic and Kern—amended their contracts to conform to the Monterey Agreement. These amendments are sometimes called the "Monterey Amendments."[2] Article 53 of Castaic's amended contract reflects a provision of the Monterey Agreement permitting Kern and other agencies to participate in, and approve, permanent water transfers totaling 130,000 acre-feet per annum.

### C. *Kern-Castaic Transfer*

In March 1999, Castaic entered into an agreement to buy a permanent entitlement to 41,000 acre-feet of SWP water from Wheeler Ridge, which receives SWP water from Kern. DWR and Kern approved the transfer. On

---

[2] In some contexts, the amendments are also called the "Monterey Amendment." For simplicity, we generally refer to them as the Monterey Amendments.

March 29, 1999, Castaic certified an EIR under CEQA that "tiered off" the EIR that Central Coast had certified regarding the Monterey Agreement.[3]

### 1. *Challenge to the 1999 EIR*

On April 30, 1999, the Friends of the Santa Clara River (Friends) sought administrative mandamus regarding the certification of the EIR (Friends's action). In July 2000, the trial court denied Friends's petition. While Friends's appeal from the denial was pending before this court, the Court of Appeal for the Third Appellate District determined that the Monterey Agreement EIR was defective and ordered it decertified. (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892 [100 Cal.Rptr.2d 173] (*Planning & Conservation League*).) The court held that Central Coast had improperly acted as lead agency regarding the EIR, and that DWR must prepare and certify a new EIR. (*Id.* at pp. 903–907.) In addition, the court ruled that the new EIR's assessment of the "no project" alternative—that is, the retention of the pre-Monterey Agreement contracts—must discuss the impact of implementing subdivision (b) of article 18, the contract term dealing with permanent water shortages. (83 Cal.App.4th. at pp. 908–920.)

In *Friends of the Santa Clara River v. Castaic Lake Water Agency* (2002) 95 Cal.App.4th 1373, 1384 [116 Cal.Rptr.2d 54] (*Friends I*), this court concluded that Castaic's EIR was defective because it tiered off the decertified Monterey Agreement EIR. As we noted, the 1999 EIR relied on the decertified Monterey Agreement EIR to establish that the environmental effects of the Monterey Agreement, including "upstream effects of the [Kern-Castaic transfer]," were negligible. (*Id.* at pp. 1384–1385.) We further stated: "We have examined all of [Friends's] other contentions and find them to be without merit. If the []tiering problem had not arisen, we would have affirmed the judgment." (*Id.* at p. 1387, italics omitted.) We thus directed the trial court to issue a writ vacating the certification of Castaic's EIR, and to retain jurisdiction until Castaic certified an EIR in compliance with CEQA. (95 Cal.App.4th at p. 1388.)

In issuing the writ on October 25, 2002, the trial court rejected Friends's request for an injunction barring Castaic from acquiring and using water through the Kern-Castaic transfer until Castaic complied with CEQA. In

---

[3] Public Resources Code section 21068.5 states: " 'Tiering' . . . means the coverage of general matters and environmental effects in an environmental impact report prepared for a policy, plan, program or ordinance followed by narrower or site-specific environmental impact reports which incorporate by reference the discussion in any prior environmental impact report and which concentrate on the environmental effects which (a) are capable of being mitigated, or (b) were not analyzed as significant effects on the environment in the prior environmental impact report."

December 2002, Friends appealed from this ruling. We granted requests by PCL to submit a brief as an amicus curiae and participate in oral argument.

In mid-2003, while Friends's appeal from the denial of injunctive relief was before us, the parties in the litigation regarding the Monterey Agreement EIR entered into a settlement agreement, often called "Monterey Plus." The agreement permitted compliance with the Monterey Agreement pending DWR's certification of the new EIR, but obliged DWR to include an analysis of the potential environmental effects of the Kern-Castaic transfer. Regarding the action over the Kern-Castaic transfer, the agreement stated: "The Parties agree that jurisdiction with respect to that litigation should remain in [the Los Angeles County Superior Court] and that nothing in this Settlement Agreement is intended to predispose the remedies or other actions that may occur in that pending litigation."

In December 2003, we affirmed the denial of injunctive relief in an unpublished opinion. (*Friends of the Santa Clara River v. Castaic Lake Water Agency* (Dec. 1, 2003, B164027) (*Friends II*).)

### 2. *Castaic's 2004 EIR*

On December 22, 2004, Castaic certified a second EIR, adopted a mitigation program and statement of overriding considerations, and approved the Kern-Castaic transfer. The EIR describes the project as the transfer of 41,000 acre-feet of Table A water from Kern and Wheeler Ridge to Castaic, which also involves the use of SWP facilities elsewhere. According to the EIR, the project "currently is being implemented by an amendment to the SWP water supply contracts of [Castaic] and [Kern] executed in 1999." It further states that DWR, Kern, and Wheeler Ridge approved the 1999 contract amendments, that the transfer was "contractually completed in 1999," and that "[n]o permits and other approvals would be required other than the certification of this EIR." The EIR describes the underlying history, including the Monterey Agreement and Amendments, the decertification of the Monterey Agreement EIR and 1999 EIR, and the Monterey Plus settlement agreement.

Regarding the water transfer, the 2004 EIR contains a section entitled "Areas of Known Controversy," which states: "The previous EIR on the Project was decertified because it tiered from the Monterey Agreement . . . EIR, which itself [was] decertified as a result of an appellate court decision. The present EIR does not tier from this or any other EIR, and examines environmental impacts that would occur with and without the change in water allocation criteria implemented as part of the Monterey Amendment[s]. Although the Monterey Amendment[s] continue[] in operation under the [Monterey Plus settlement agreement], this EIR evaluates a reasonable worst-case scenario of SWP operations without the Monterey Amendment[s]."

In analyzing the transfer's environmental impacts, the 2004 EIR examines three "scenarios" regarding the transfer. The EIR states: "The transfer of [the] Table A amount that is the subject of this EIR was implemented under [the] permanent transfer provision of the Monterey Amendment[s], although the transfer could be implemented under Article 41 of [Castaic's] original Water Supply Contract."[4] The EIR further explains: "DWR is in the process of preparing a new EIR for the Monterey Amendment[s]. Since the Monterey Amendment[s] change[] the way SWP supplies are allocated among Contractors, this EIR provides three separate analyses of the Project's impacts to water supply available to [Wheeler Ridge] and [Castaic]. The three analyses represent three possible scenarios for allocating available SWP water supplies among Contractors, and provide an evaluation of the amount of SWP supply that would be associated with the 41,000 [acre-feet] of Table A Amount under each of the allocation scenarios." The three scenarios examined in the 2004 EIR are: (1) SWP allocation with the Monterey Amendments; (2) SWP allocation without the Monterey Amendments, and with the "agriculture first" reduction provision of article 18(a) in place; and (3) SWP allocation without the Monterey Amendments, but with permanent cutbacks under article 18(b).

The scenarios examine how the water allocation criteria under the pertinent contractual regimes would affect DWR's delivery of water for the transfer during water shortages. The first scenario assumes that the transfer is implemented under the Monterey Amendments, and addresses the delivery of water under the allocation criteria of the Monterey Amendments. The remaining two scenarios assume that the transfer is implemented under the pre-Monterey Agreement contractual regime, which incorporated different allocation criteria for temporary and permanent shortages. Specifically, the second scenario examines the possibility of temporary shortages, and assesses the delivery of water under article 18(a) of the pre-Monterey Agreement contracts, which concerns temporary shortages; the third scenario contemplates a permanent shortage, and assesses the delivery of water under article 18(b), which concerns permanent shortages.

The 2004 EIR examines the environmental effects of the transfer under all three scenarios for the SWP (and associated facilities), Wheeler Ridge, and Castaic. According to the EIR, the transfer will have no significant impacts on the SWP or the Wheeler Ridge service area. Regarding the Castaic service area, the EIR concludes that the transfer will have some significant indirect impacts (largely associated with new population growth), and proposes mitigation measures to address these impacts.

---

[4] Article 41 of the original contracts between DWR and local suppliers states: "No assignment or transfer of this contract or any part hereof, rights hereunder, or interest herein by the Agency shall be valid unless and until it is approved by the State and made subject to such reasonable terms and conditions as the State may impose."

The 2004 EIR also examines five alternatives to the transfer, including a "[n]o [p]roject" alternative, under which Castaic would obtain neither the 41,000 acre-feet of water nor the contractual rights to it. The remaining alternatives study the impact of relying on groundwater or desalinated seawater, and of receiving less or more than 41,000 acre-feet of SWP water.

### 3. *Underlying Challenge to 2004 EIR*

In late December 2004, Castaic filed a return to the writ issued by Los Angeles County Superior Court, asserting that the 2004 EIR complied with the writ. On January 24, 2005, PCL and CWIN initiated separate actions in Ventura County Superior Court, seeking administrative mandamus on the ground that the EIR contravened CEQA.[5] Their petitions named Castaic as respondent, and Kern, Wheeler Ridge, and DWR as real parties in interest.

On February 1, 2005, Friends voluntarily dismissed its action with prejudice. Accompanying the dismissal was an explanation from Friends's counsel, who noted the existence of PCL's and CWIN's actions, and stated: "While Friends believes that the new [EIR] neither complies with [CEQA] nor [complies] with the views expressed [in the *Friends I* opinion], Friends does not desire to initiate an entirely new legal challenge to the 2004 [EIR] due to limited funding of this not-for-profit organization."

By ex parte application, Castaic sought to vacate the dismissal, arguing that it contravened our directions in *Friends I* and *Friends II*, and was intended to assist PCL and CWIN "in their forum shopping exploits in Ventura." In opposing the application, Friends's counsel stated: "We can give up, and we have given up. We may not want to, but Friends does not have the financial wherewithal to continue going on contesting new EIR[]s." The trial court denied the ex parte application. Castaic sought relief from this ruling by petition for writ of mandate, which we denied.[6]

Before the Ventura County Superior Court, Castaic demurred to PCL's and CWIN's actions, contending that the doctrine of res judicata barred them, and that only the trial court in the Friends's action had jurisdiction over PCL's and CWIN's claims. In May 2005, the Ventura County Superior Court consolidated the actions. In July 2005, the court concluded that venue was proper in Los Angeles County Superior Court and transferred the actions, but otherwise declined to rule on Castaic's demurrers.

Following the transfer, the trial court overruled the demurrers, finding the petitions were not barred by res judicata. On April 2, 2007, following trial,

---

[5] CWIN's complaint also asserted other claims that CWIN ultimately did not pursue.

[6] Castaic also noticed an appeal from Friends's voluntary dismissal and denial of its ex parte application. On May 17, 2005, we granted Friends's motion to dismiss the appeal.

the court issued its statement of decision on PCL's and CWIN's petitions. The court rejected their principal challenges to the 2004 EIR, but nonetheless found that there was "a hole" in the EIR. Specifically, the court concluded that the EIR did not adequately explain the relevance of the pending Monterey Agreement EIR to the three water delivery scenarios discussed in the 2004 EIR. On May 22, 2007, the trial court issued a peremptory writ directing Castaic to set aside the EIR and cure the identified defect.

## DISCUSSION

On appeal, PCL and CWIN renew their contentions of error regarding the 2004 EIR; in the cross-appeal, Castaic, Kern, and Wheeler Ridge (cross-appellants) argue that the doctrine of res judicata precludes appellants' actions regarding the EIR, and that the trial court erred in determining that the EIR is defective.[7] For the reasons explained below, we conclude that the EIR contains no material defects, and otherwise reject the parties' contentions.

### A. *Res Judicata*

We begin by examining cross-appellants' contention that the doctrine of res judicata bars the challenges to the 2004 EIR.

#### 1. *Governing Principles*

As cross-appellants raised the defense of res judicata by demurrers to PCL's and CWIN's petitions, our review follows established principles. "If all of the facts necessary to show that an action is barred by res judicata are within the complaint or subject to judicial notice, a trial court may properly sustain a general demurrer. [Citation.] In ruling on a demurrer based on res judicata, a court may take judicial notice of the official acts or records of any court in this state. [Citations]." (*Frommhagen v. Board of Supervisors* (1987) 197 Cal.App.3d 1292, 1299 [243 Cal.Rptr. 390].) Here, the trial court took judicial notice of pertinent records from the Friends action, including Friends's request to dismiss the action, Castaic's ex parte application to set aside the dismissal, and the reporter's transcript from the hearing on the application.

In addressing the demurrers, the trial court was obliged to determine whether the petitions stated a cause of action, accepting as true all material facts properly pleaded in the petitions, and disregarding conclusions of law

---

[7] DWR, though not a cross-appellant, has filed a respondent's brief urging this court to reject PCL and CWIN's appeal.

and allegations contrary to judicially noticed facts. (*Burt v. County of Orange* (2004) 120 Cal.App.4th 273, 277 [15 Cal.Rptr.3d 373].) We examine the trial court's determinations on this matter de novo, applying the same principles. (See *id.* at p. 279.)

■ Generally, " '[r]es judicata' describes the preclusive effect of a final judgment on the merits. Res judicata, or claim preclusion, prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them. Collateral estoppel, or issue preclusion, 'precludes relitigation of issues argued and decided in prior proceedings.' [Citation]." (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896 [123 Cal.Rptr.2d 432, 51 P.3d 297], fn. omitted.) Although the term "res judicata" is often applied to both doctrines, we follow our Supreme Court in limiting its scope to claim preclusion. (*Id.* at p. 896, fn. 7.)

■ Claim preclusion applies when "(1) the decision in the prior proceeding is final and on the merits; (2) the present proceeding is on the same cause of action as the prior proceeding; and (3) the parties in the present proceeding or parties in privity with them were parties to the prior proceeding." (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1202 [24 Cal.Rptr.3d 543] (*Federation*).) Upon satisfaction of these conditions, claim preclusion bars "not only . . . issues that were actually litigated but also issues that could have been litigated." (*Ibid.*)

The focus of our examination is on the bar rule of claim preclusion. Under this rule, "a judgment for the defendant serves as a bar to further litigation of the same cause of action." (*Mycogen Corp. v. Monsanto Co., supra*, 28 Cal.4th at p. 897.) Here, the trial court concluded the rule was inapplicable because the facts—as disclosed by the petitions and the matters of which it had taken judicial notice—established only two of the rule's three requirements. In overruling the demurrers, the trial court determined that Friends's voluntary dismissal of its action with prejudice was a retraxit, and as such, constituted a judgment on the merits in Castaic's favor; moreover, it found that PCL and CWIN asserted the cause of action litigated by Friends. However, the trial court determined that PCL and CWIN were not in privity with Friends.[8]

■ Like the trial court, we conclude that Friends's dismissal constituted a judgment for purposes of the bar rule. As explained in *Le Parc Community Assn. v. Workers' Comp. Appeals. Bd.* (2003) 110 Cal.App.4th 1161, 1169 [2 Cal.Rptr.3d 408]: " 'In the common law, a retraxit was "a voluntary renunciation by plaintiff in open court of his suit and cause thereof, and by it

---

[8] After ruling on the demurrers, the trial court determined that Friends's dismissal of its action did not collaterally estop PCL and CWIN from challenging Castaic's status as the lead agency responsible for preparing the EIR. Cross-appellants do not challenge this determination.

plaintiff forever loses his action." [Citations.] In California, the same effect is now accomplished by a dismissal with prejudice. [Citations.]' [Citation.]" However, for the reasons explained below, we conclude that neither the identical-cause-of-action nor the privity requirement was satisfied.

### 2. *Different Causes of Action*

■ We begin with the trial court's determination that appellants have asserted the same cause of action as Friends.[9] For purposes of the doctrine of res judicata, California law identifies a single cause of action as "the violation of a single primary right." (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 681 [34 Cal.Rptr.2d 386, 881 P.2d 1083].) "The plaintiff's primary right is the right to be free from a particular injury, regardless of the legal theory on which liability for the injury is based. [Citation.] The scope of the primary right therefore depends on how the injury is defined. A cause of action comprises the plaintiff's primary right, the defendant's corresponding primary duty, and the defendant's wrongful act in breach of that duty.[10] [Citation.]" (*Federation, supra*, 126 Cal.App.4th at p. 1202.)

■ As a cause of action is framed by the facts in existence when the underlying complaint is filed, res judicata "is not a bar to claims that arise after the initial complaint is filed." (*Allied Fire Protection v. Diede Construction, Inc.* (2005) 127 Cal.App.4th 150, 155 [25 Cal.Rptr.3d 195] (*Allied Fire Protection*); see *Yager v. Yager* (1936) 7 Cal.2d 213, 217 [60 P.2d 422].) For this reason, the doctrine may not apply when "there are changed conditions and new facts which were not in existence at the time the action was filed upon which the prior judgment is based. [Citations.]" (*McGaffey v. Sudowitz* (1961) 189 Cal.App.2d 215, 217–218 [10 Cal.Rptr. 862].) This exception to the doctrine encompasses claims based on rights that arise after the filing of the complaint in the first action, but before judgment is entered. (*Yager v. Yager, supra*, 7 Cal.2d at p. 217.) As the court explained in *Allied Fire Protection*: "These rights may be asserted in a supplemental pleading, but if such a pleading is not filed a plaintiff is not foreclosed from asserting the rights in a subsequent action. [Citation.] The general rule that a judgment is conclusive as to matters that could have been litigated 'does not apply to new rights acquired pending the action which might have been, but which

---

[9] Cross-appellants suggest that we may not examine this determination because appellants (as cross-respondents) have not challenged it in their briefs. We disagree. As our Supreme Court has explained, a respondent does not concede contentions asserted in an appellant's opening brief by failing to address them. (*People v. Hill* (1992) 3 Cal.4th 959, 995, fn. 3 [13 Cal.Rptr.2d 475, 839 P.2d 984], overruled on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].)

[10] When the material facts are undisputed, whether different parties have asserted the same cause of action constitutes a question of law. (*Le Parc Community Assn. v. Workers' Comp. Appeals. Bd., supra*, 110 Cal.App.4th at pp. 1168, 1171–1173.)

were not, required to be[,] litigated [citations].' [Citation.]" (*Allied Fire Protection, supra,* 127 Cal.App.4th at p. 155.)

An instructive application of these principles is found in *Yates v. Kuhl* (1955) 130 Cal.App.2d 536 [279 P.2d 563] (*Yates*). There, the plaintiffs obtained the right to a water supply for their land through a deed from the defendants, who owned adjoining land. (*Id.* at pp. 537–538.) In the plaintiffs' first action, they alleged that the defendants had wrongfully cut off the water supply by failing to maintain a dam and weir that diverted water onto the plaintiffs' land. (*Id.* at p. 538.) Before judgment was entered in the action, the defendants modified the weir so that it denied water to the plaintiffs' land. (*Id.* at pp. 538–539.) The plaintiffs made no attempt to assert a new claim in their first action, in which the trial court issued a judgment in their favor; they filed a new action, and again prevailed. (*Ibid.*) The appellate court rejected the defendants' contention that the doctrine of res judicata barred the second action, reasoning that the actions involved separate episodes of misconduct resulting in "successive causes of action arising out of the same general subject matter—the right to the water." (*Id.* at p. 540.)

Here, as in *Yates*, Friends's action and the underlying actions involve distinct episodes of purported noncompliance regarding "the same general subject matter" (*Yates, supra,* 130 Cal.App.2d at p. 540), namely, the public's statutory right to an adequate EIR concerning the Kern-Castaic transfer (Pub. Resources Code, §§ 21100, subd. (a), 21151, subd. (a)). After Friends's petition challenged Castaic's defective 1999 EIR, the trial court in Friends's action ordered it decertified and retained jurisdiction until Castaic certified an EIR that complied with CEQA. Friends was permitted to challenge Castaic's 2004 EIR by motion or supplemental petition in the original action, *or* by petition in a new action (*City of Carmel-by-the-Sea v. Board of Supervisors* (1982) 137 Cal.App.3d 964, 971 [187 Cal.Rptr. 379]), but it took neither of these alternatives. As the 1999 EIR and 2004 EIR are factually distinct attempts to satisfy CEQA's mandates and Friends was not required to litigate the 2004 EIR in its original action, we conclude that Friends's action and the underlying actions involved different causes of action.[11]

---

[11] Before the trial court, Castaic contended that the 2004 EIR could be challenged only in the Friends's action. As cross-appellants do not raise this contention in their opening briefs and otherwise allude to it only in a footnote in their reply briefs, it is forfeited. (*Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 624, fn. 2 [12 Cal.Rptr.2d 741].) Moreover, were we to consider the contention, we would find it fails on the merits.

Below, Castaic argued that the Monterey Plus settlement agreement "vest[ed] exclusive jurisdiction" regarding the 2004 EIR in the Friends's action. In addition, Castaic pointed to the writ issued in the Friends's action, stating that the trial court in that action retained jurisdiction over the matter, and to Public Resources Code section 21168.9, subdivision (b), which

Cross-appellants' reliance on *Federation, supra*, 126 Cal.App.4th 1180, is misplaced.[12] There, a city certified an EIR concerning amendments to the city's general plan, and approved the amended general plan. (126 Cal.App.4th at pp. 1188–1190.) After a public interest group sought administrative mandamus regarding the EIR and amendments to the general plan, the trial court rejected the challenges to the EIR, but ultimately issued a writ directing the city to correct the amendments. (*Id.* at pp. 1190–1191.) When the city did so, the group again sought administrative mandamus, and asserted new challenges to the EIR. (*Id.* at pp. 1193, 1204.) The appellate court held that the doctrine of res judicata barred their cause of action regarding the EIR. (*Id.* at pp. 1202–1205.) In so concluding, the court noted that an "injury," for purposes of determining a primary right, "is defined in part by reference to the set of facts, or transaction, from which the injury arose." (*Id.* at p. 1203.) As the group challenged the same EIR and the material facts had not changed, the court determined that the second action involved the same primary right. (*Id.* at p. 1204.) Here, unlike the situation in *Federation*, the two actions address materially different EIR's, and therefore involve distinct causes of action.

### 3. *Lack of Privity*

The remaining issue is whether appellants are in privity with Friends. As this court has explained, "[i]n the context of a res judicata determination, privity ' "refers 'to a mutual or successive relationship to the same rights of property, or to such an identification in interest of one person with another as to represent the same legal rights [citations] . . . .' " ' [Citation.] ' "[T]he determination of privity depends upon the fairness of binding [a party] with the result obtained in earlier proceedings in which it did not participate. [Citation.] ' "Whether someone is in privity with the actual parties requires

---

provides in part: "The trial court shall retain jurisdiction over the public agency's proceedings by way of a return to the peremptory writ until the court has determined that the public agency has complied with this division."

In our view, none of these observations establishes that the Friends's action provided the exclusive forum for challenges to the 2004 EIR. As the trial court observed, the Monterey Plus settlement agreement contains no term granting the trial court in the Friends's action exclusive jurisdiction over the 2004 EIR. Moreover, as explained above, although the trial court in a mandamus proceeding ordinarily retains continuing jurisdiction to make any order necessary to enforce a writ it has issued, the petitioner may challenge the agency's action that purports to comply with the writ in *a new action*. (*City of Carmel-by-the-Sea v. Board of Supervisors, supra*, 137 Cal.App.3d at p. 971.)

[12] Cross-appellants also purport to find support for their contention in *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*). As this case does not address the identity of primary rights in CEQA actions, it is not authority on the question before us. (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 243 [45 Cal.Rptr.2d 207, 902 P.2d 225].)

close examination of the circumstances of each case." ' " ' [Citation.] 'This requirement of identity of parties or privity is a requirement of due process of law.' [Citation.]" (*Consumer Advocacy Group, Inc. v. ExxonMobil Corp.* (2008) 168 Cal.App.4th 675, 689–690 [86 Cal.Rptr.3d 39] (*Consumer Advocacy Group*).)

■ As Friends undertook its action on behalf of the public, the key question regarding privity is whether Friends adequately acted as appellants' " 'virtual representative.' " (*Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn.* (1998) 60 Cal.App.4th 1053, 1070–1073 [71 Cal.Rptr.2d 77] (*Citizens for Open Access*).) "A party is adequately represented for purposes of the privity rule 'if his or her interests are so similar to a party's interest that the latter was the former's virtual representative in the earlier action. [Citation.]' [Citation.] We measure the adequacy of 'representation by inference, examining whether the . . . party in the suit which is asserted to have a preclusive effect had the same interest as the party to be precluded, and whether that . . . party had a strong motive to assert that interest. If the interests of the parties in question are likely to have been divergent, one does not infer adequate representation and there is no privity. [Citations.] If the . . . party's motive for asserting a common interest is relatively weak, one does not infer adequate representation and there is no privity. [Citation.]' [Citation.]" (*Id.* at pp. 1070–1071.)[13] (See *Consumer Advocacy Group, supra*, 168 Cal.App.4th at p. 692.)

Although Friends and appellants have alleged different causes of action (see pt. C.1., *ante*), their pursuit of these claims on behalf of the public is sufficient to show a "common interest" in the enforcement of CEQA, for purposes of a privity determination. (See *Consumer Advocacy Group, supra*, 168 Cal.App.4th at pp. 689–693 [two organizations that alleged distinct causes of action in the public interest under same antipollution statute and against same defendant are nonetheless in privity].) Accordingly, the dispositive question is whether Friends asserted the common interest with adequate vigor.

■ In examining this question, we look not only at Friends's allegations in its petition, but at the manner in which Friends conducted and resolved its action. In *Citizens for Open Access*, some state agencies sued on behalf of the public to secure public access to certain beaches, and entered into a settlement that created public easements. (*Citizens for Open Access, supra*, 60 Cal.App.4th at pp. 1055–1062.) When a public interest group challenged the

---

[13] Appellants argue that cross-appellants have forfeited their contentions regarding virtual representation by failing to present them to the trial court. We disagree. In demurring to PCL's and CWIN's petitions, Castaic relied on California decisions describing and applying the theory of virtual representation.

settlement in a second action, the trial court ruled that res judicata barred the action. (*Id.* at p. 1063.) In concluding that the group was in privity with the state agencies in the prior action, the appellate court noted that the agencies had "zealously" pursued the action; in addition, the court determined that "[t]he settlement agreement was the product of a reasonable compromise, and [did] not carry with it even the hint of any abdication of the role of public agent . . . ." (*Id.* at p. 1072.) Similarly, in *Consumer Advocacy Group*, an organization sued on behalf of the public under an antipollution statute and entered into a settlement that obliged the defendant to remediate the polluted sites. (*Consumer Advocacy Group, supra,* 168 Cal.App.4th at p. 692.) As nothing suggested that the organization's settlement "abandoned its intention to represent the interests of the general public," we concluded that its litigation displayed a level of care regarding the public's interest sufficient to create privity with another organization, which had pursued a similar action. (*Ibid.*) In contrast, when a party's conduct in an action shows a lack of incentive or resources to litigate a common interest—for example, by failing to appear and thus accepting an unfavorable default judgment—privity is not established. (*Gottlieb v. Kest* (2006) 141 Cal.App.4th 110, 152–153 [46 Cal.Rptr.3d 7] [discussing cases].)

Here, Friends terminated its action through a voluntary dismissal, not through a settlement. In seeking the dismissal and opposing Castaic's application to vacate the dismissal, Friends stated that it regarded the 2004 EIR as defective, but that it lacked the funds to challenge the 2004 EIR. These statements display an "abdication of the role of public agent" (*Citizens for Open Access, supra,* 60 Cal.App.4th at p. 1072) and an abandonment of "its intention to represent the interests of the general public" (*Consumer Advocacy Group, supra,* 168 Cal.App.4th at p. 692). In view of these statements, we cannot infer that the parties are in privity.

Pointing to appellants' decision to file their petitions in Ventura County rather than intervene in the Friends action, cross-appellants contend that Friends's explanation for its dismissal was disingenuous. They urge us to find that Friends dismissed its action under an agreement with appellants, who were engaged in "forum shopping." They further argue that because Friends colluded with appellants in this manner, we should conclude that Friends acted as their representative in dismissing its action.

In advancing this contention, cross-appellants misapprehend our standard of review. The existence of privity ordinarily presents a question of law when the material facts are undisputed. (*Victa v. Merle Norman Cosmetics, Inc.* (1993) 19 Cal.App.4th 454, 464 [24 Cal.Rptr.2d 117].) Nonetheless, a demurrer based on res judicata is properly sustained only if the pleadings and judicially noticed facts conclusively establish the elements of the doctrine.

*(Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325 [48 Cal.Rptr.2d 87, 906 P.2d 1242].) When the requisite determinations cannot be made on this limited record, the party asserting the defense may attempt to establish them by a motion to dismiss supported by affidavits or in a trial *(Garcia v. Garcia* (1957) 148 Cal.App.2d 147, 152 [306 P.2d 80]), in which case the trial court's factual findings are reviewed for the existence of substantial evidence *(Best v. Fitzgerald* (1947) 81 Cal.App.2d 965, 966–967 [185 P.2d 377]).

Here, the pleadings and judicially noticed facts raise conflicting inferences regarding Friends's motive for the dismissal, which is critical to the determination of privity. This factual conflict cannot be resolved on demurrer.[14] *(Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort, supra,* 91 Cal.App.4th at p. 882 ["The appropriate setting for resolving facts reasonably subject to dispute is the adversary hearing."].) Nor did the trial court do so.[15] We decline to resolve this factual dispute for the first time on appeal.[16]

Pointing to *Mooney v. Caspari* (2006) 138 Cal.App.4th 704 [41 Cal.Rptr.3d 728] *(Mooney),* cross-appellants contend that for purposes of privity, the adequacy of representation is determined solely by the alignment of the parties' interests, regardless of the purported representative's conduct. We disagree. In *Mooney,* the plaintiff's business partner unsuccessfully sued his counsel for malpractice related to a contract in which the plaintiff and the partner had identical interests. *(Mooney, supra,* 138 Cal.App.4th at p. 713.)

---

[14] Although the parties do not dispute that Friends stated that it was dismissing its action due to a lack of funds, the truth of this statement is not subject to judicial notice. *(Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 882 [110 Cal.Rptr.2d 877].)

[15] In overruling the demurrers, the trial court remarked that appellants probably knew that Friends intended to dismiss its action, and concluded that this *"may* show collusion, as Castaic suggests" (italics added). However, the trial court determined that Friends was not representing appellants when it dismissed its action, because appellants intended to assert defects in the 2004 EIR that Friends had not raised about the 1999 EIR. The trial court thus made no finding regarding whether Friends dismissed its action to facilitate forum shopping.

[16] Pointing primarily to federal case authority, cross-appellants also suggest that we may infer privity from PCL's and CWIN's " 'tactical maneuvering,' " that is, their failure to intervene in the Friends action, despite their awareness of this action. This contention fails for two reasons. As the United States Supreme Court has remarked, a party's failure to intervene in an action of which it has notice is not, by itself, a conclusive basis for privity. *(Richards v. Jefferson County* (1996) 517 U.S. 793, 799, fn. 5 [135 L.Ed.2d 76, 116 S.Ct. 1761].) Moreover, as cross-appellants concede, under the applicable federal principles, privity requires adequate representation, which exists only when "(1) the interests of the nonparty and [its] representative are aligned . . . [citation]; and (2) either the party understood [itself] to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." *(Taylor v. Sturgell* (2008) 553 U.S. 880, ___ [171 L.Ed.2d 155, 128 S.Ct. 2161, 2176].) Because Friends expressly relinquished its role as public representative in dismissing its action, the determination of the second requirement presents a factual question that cannot be resolved on appeal, namely, whether Friends's explanation for its dismissal was accurate.

The plaintiff later sued his own lawyer for failing to file a timely malpractice action against his partner's counsel, who the plaintiff alleged had also represented him regarding the contract. (*Id.* at pp. 713–716.)

In holding that the judgment in the partner's malpractice action barred the plaintiff's suit, the *Mooney* court concluded that the partner had adequately represented the plaintiff in the prior action, as they shared interests and motives, and the plaintiff had vigorously aided his partner in the action. (*Mooney, supra,* 138 Cal.App.4th at pp. 719–720.) The court rejected the plaintiff's contention that the representation was inadequate due to the partner's failure to offer some meritorious arguments and evidence, reasoning that privity does not depend on the identity of evidence or arguments, or on the result obtained. (*Id.* at p. 721.) However, nothing in *Mooney* suggests that a party may expressly *abandon* its role as representative while preserving privity. As we have explained, in dismissing its action, Friends stated that it could no longer act as a representative. In sum, the trial court properly overruled cross-appellants' demurrers on the grounds of res judicata.

### B. *Adequacy of the 2004 EIR*

We turn to the parties' contentions regarding the 2004 EIR. Under CEQA, an EIR must be prepared before a public agency approves any project that may have a significant effect on the environment. (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 687–688 [125 Cal.Rptr.2d 745].) CEQA and its related regulations—ordinarily called "Guidelines" (Cal. Code Regs., tit. 14, § 15001 et seq.)—define an EIR as "an informational document" whose purpose "is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (Pub. Resources Code, § 21061; see Guidelines, § 15003, subds. (b)–(e).) As explained below, we discern no deficiency in the 2004 EIR.

### 1. *Standard of Review*

"In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' (Pub. Resources Code, § 21168.5.) Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.]" (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426–427 [53 Cal.Rptr.3d 821, 150 P.3d 709], fn. omitted (*Vineyard*).)

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.] We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the [agency] and whether it contains substantial evidence to support the [agency]'s factual determinations." (*Vineyard, supra,* 40 Cal.4th at p. 427.)

### 2. *Appellants' Contentions*

We begin with appellants' challenges to the 2004 EIR. Their principal contention is that only DWR may properly conduct an environmental review of the Kern-Castaic transfer; in addition, they argue that the 2004 EIR misrepresents the relevance of the pending Monterey Agreement EIR to the Kern-Castaic transfer, and contains related errors regarding the project and its alternatives.

### a. *Relationship of DWR's Review of Monterey Agreement to Kern-Castaic Transfer*

Appellants contend that Castaic, in preparing the 2004 EIR, has usurped DWR's duties as the lead agency conducting the environmental review of the Monterey Agreement. Under CEQA, a lead agency is "the public agency which has the principal responsibility for carrying out or approving a project which may have significant effect upon the environment." (Pub. Resources Code, § 21067.) The crux of appellants' contention is that DWR must examine the transfer because it is a part of the project under review by DWR, namely, the Monterey Agreement and the contractual regime implemented under it. For the reasons explained below, we disagree.[17]

CEQA imposes requirements regarding (1) the time at which a project is defined and (2) the breadth of the definition. Because the EIR is intended to inform an agency's decision regarding the project, CEQA requires that "[a]n accurate, stable and finite description" of the project be established "early enough in the planning stages of [the] project to enable environmental concerns to influence the project's program and design, yet late enough to

---

[17] The trial court concluded that appellants had forfeited this contention by failing to present it in a timely manner before trial, but nonetheless proceeded to address and reject it on the merits. Because the contention presents a question of law on essentially undisputed facts, we examine it on appeal. (*Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 879 [242 Cal.Rptr. 184] ["[A]n appellate court may allow an appellant to assert a new theory of the case on appeal where the facts were clearly put at issue at trial and are undisputed on appeal."].)

provide meaningful information for environmental assessment." (*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 738 [270 Cal.Rptr. 650].) Moreover, to enhance protection of the environment, CEQA defines "project" broadly to encompass "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (Guidelines, § 15378, subds. (a), (c).) This definition precludes "piecemeal review which results from 'chopping a large project into many little ones— each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences.' " (*Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 370 [7 Cal.Rptr.2d 307], quoting *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283–284 [118 Cal.Rptr. 249, 529 P.2d 1017].)

 Reconciling these requirements is problematic when a project lays the foundation for subsequent—but perhaps uncertain—activity. In *Laurel Heights, supra,* 47 Cal.3d 376, our Supreme Court examined the appropriate balance between these competing concerns in addressing the extent to which an EIR must encompass "future action related to the proposed project." (*Id.* at p. 395.) There, the University of California bought an office building with the long-term goal of fully occupying it, but its EIR considered only the consequences of operating a research facility in a portion of the building. (*Id.* at pp. 388–390.) In concluding that the EIR was defective, the court stated: "[A]n EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects. Absent these two circumstances, the future expansion need not be considered in the EIR for the proposed project. Of course, if the future action is not considered at that time, it will have to be discussed in a subsequent EIR before the future action can be approved under CEQA." (*Id.* at p. 396.) Regarding the first circumstance, the court elaborated: "We do not require prophecy. . . . Nor do we require discussion in the EIR of specific future activity that is merely contemplated or a gleam in a planner's eye." (*Id.* at p. 398.)

We conclude that DWR's environmental review of the Monterey Agreement does not encompass the Kern-Castaic transfer. To begin, nothing before us suggests that the Monterey Agreement, viewed as a CEQA project, included the Kern-Castaic transfer when the original Monterey Agreement EIR was prepared and certified in 1995. The Monterey Agreement, as executed in December 1994, laid the foundation for a new contractual regime between DWR and its contractors, and freed water provided to agricultural suppliers for transfer to urban suppliers. However, the specific contractual developments for the Kern-Castaic transfer—which involves some of this water—culminated in

March 1999, shortly before the certification of Castaic's 1999 EIR. As the Kern-Castaic transfer was no more than "a gleam in a planner's eye" at the time of the Monterey Agreement, the transfer fell outside the original Monterey Agreement EIR, and was properly considered in a separate EIR. (*Laurel Heights, supra*, 47 Cal.3d at pp. 396–398.)

We also conclude that the decertification of the 1995 Monterey Agreement EIR and its aftermath have not brought the transfer within the compass of the new Monterey Agreement EIR. At the outset, we note that neither the decision in *Planning & Conservation League*—which directed the decertification of the 1995 Monterey Agreement EIR—nor the subsequent Monterey Plus settlement agreement purports to place the transfer under DWR's review.[18] However, these facts alone do not settle whether the events following the decertification of the 1995 Monterey Agreement have operated to bring the transfer within the scope of DWR's review.

■ After the 1995 Monterey Agreement EIR and Castaic's 1999 EIR were vacated as defective, the Monterey Amendments and the Kern-Castaic transfer remained operative pending the preparation of new EIR's. Generally, the fact that a project is allowed to proceed while an adequate EIR is prepared does not diminish CEQA's requirements: the agency preparing the new EIR "must begin anew the analytical process required under CEQA," and may not rely on "*post hoc* rationalizations" in approving the project. (*Laurel Heights, supra*, 47 Cal.3d at pp. 424–425.)[19] Accordingly, we must examine whether the implementation of the transfer prior to the certification of DWR's Monterey Agreement EIR placed the transfer within the project under review by the DWR.

[18] We reject appellants' suggestion that the appellate court in *Planning & Conservation League* determined that only DWR may evaluate the Kern-Castaic transfer. There, the court concluded only that DWR was the appropriate agency to prepare the Monterey Agreement EIR, reasoning that only DWR has "a statewide perspective and expertise" regarding the Monterey Agreement. (*Planning & Conservation League, supra*, 83 Cal.App.4th at pp. 904–907.) The decision contains no discussion of whether DWR's review encompasses the Kern-Castaic transfer.

[19] In *Laurel Heights*, the Supreme Court permitted the University of California to operate its research facility in the office building pending the preparation of an adequate EIR, but cautioned: "We emphasize that neither the present activity we are allowing to continue nor any prior . . . activities involving [the facility] . . . can serve as a proper basis for rejecting feasible alternatives to the [facility's] site. We shall not countenance any attempt to reject an alternative on the ground that the [facility's] site has already been purchased or that activities there have already commenced. The Regents must begin anew the analytical process required under CEQA. We will not accept *post hoc* rationalizations for actions already taken, particularly in light of the fact that those activities were begun in violation of CEQA, even if done so in good faith. To do so would tarnish the integrity of the decisionmaking process required by CEQA." (*Laurel Heights, supra*, 47 Cal.3d at p. 425.)

We find guidance on this question from *Del Mar Terrace Conservancy, Inc. v. City Council* (1992) 10 Cal.App.4th 712 [12 Cal.Rptr.2d 785] (*Del Mar Terrace*), disapproved on another ground in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576, footnote 6 [38 Cal.Rptr.2d 139, 888 P.2d 1268]. In that case, the California Department of Transportation (Caltrans) proposed to build a highway that would form part of the state highway system, and a city joined Caltrans in planning a segment of the highway within the city's jurisdiction. (*Del Mar Terrace*, at pp. 720–721.) When lack of funding and other problems hindered the highway's development, the city, acting as lead agency, certified an EIR for the highway segment. (*Id.* at pp. 721–725.) The appellate court concluded that the EIR did not constitute improper "piecemeal" review under CEQA, reasoning that the highway segment had "substantial independent utility" (that is, "local utility" independent of the full highway), and that uncertainties existed regarding the ultimate completion of the full highway. (*Del Mar Terrace*, at pp. 731–737.) The court stated: "Where . . . environmental review of one project includes in general terms discussion of the potential effects of an anticipated future project, which is still contingent upon the happening of events which are currently outside the powers of the decision makers to cause, we do not believe such an EIR can be said to have failed to fulfill its purpose of providing adequate, complete, and good faith efforts at full disclosure of information about the effect which the proposed project is likely to have on the environment." (*Id.* at pp. 736–737.)

Here, as in *Del Mar Terrace*, the Kern-Castaic transfer has significant independent or local utility, in view of its benefits to Castaic's service area and relative autonomy from the Monterey Agreement. As we elaborate below (see pt. B.2.c., *post*), although the Monterey Agreement, in fact, facilitated the transfer, there is substantial evidence (1) that the transfer could have been implemented under the pre-Monterey Agreement contractual regime, and (2) that the parties intend to continue the transfer, regardless of the outcome of DWR's environmental review of the Monterey Agreement. Moreover, as explained below, Castaic's 2004 EIR adequately reflects the potential environmental effects of the Monterey Agreement, the approval of which is "outside [Castaic's] powers" (*Del Mar Terrace, supra*, 10 Cal.App.4th at p. 736), as well as the controversy attached to the transfer arising from DWR's review.

Appellants suggest that in *Friends I*, this court determined that the Kern-Castaic transfer was properly part of the project under DWR's review.[20] They are mistaken. In addressing whether Castaic's 1999 EIR tiered off the original Monterey Agreement EIR, we placed special emphasis on the 1999

---

[20] Appellants also suggest that the trial court made this finding. In fact, the trial court reached the contrary conclusion.

EIR's express admission that it did so. (*Friends I, supra*, 95 Cal.App.4th at p. 1386.) We also noted that the 1995 Monterey Agreement EIR characterized itself as a " 'program' EIR," and that the 1999 EIR stated that the transfer *might* be viewed as one of the projects " 'evaluated on a programmatic basis in the Monterey Agreement EIR.' " (*Id.* at pp. 1377, 1384.) However, as we did not examine whether the Monterey Amendments, viewed as a CEQA project, encompassed the transfer, our decision contains no determination on the matter.[21] (*People v. Banks* (1993) 6 Cal.4th 926, 945 [25 Cal.Rptr.2d 524, 863 P.2d 769] [language contained in a judicial opinion is " ' "to be understood in the light of the facts and issue then before the court, and an opinion is not authority for a proposition not therein considered. [Citation.]" ' "].)

Appellants contend that CEQA's demand for informed decisionmaking mandates either (1) that DWR conduct the environmental review of the transfer or (2) that Castaic await the outcome of DWR's review of the Monterey Agreement before approving the transfer. This contention fails in light of *Vineyard, supra*, 40 Cal.4th 412. There, a county approved an EIR for a real estate development. (*Id.* at pp. 421–424.) The EIR lacked a full analysis of future water supplies, and stated that any such analysis must await the environmental review of a pending master plan for the supply of water to the area encompassing the development. (*Id.* at p. 440.) In concluding that the EIR improperly tiered off a future EIR for the master plan, our Supreme Court explained that CEQA obliged the county to assess the master plan's environmental impact in the development's EIR, even if this "might result in subsequent duplication," or, alternatively, to defer action until the master plan had been reviewed and approved. (40 Cal.4th at pp. 440–441.) In view of *Vineyard*, Castaic could properly certify the 2004 EIR prior to the new Monterey Agreement EIR, provided that the 2004 EIR adequately assesses the environmental impact of the Monterey Agreement, to the extent necessary for a fully informed decision regarding the Kern-Castaic transfer.[22] As explained below (see pt. B.2.c., d. & e., *post*), we see no deficiencies in the 2004 EIR.

---

[21] Under CEQA, a program EIR does not inevitably encompass all activity flowing from the programmatic project evaluated in the EIR. CEQA defines a "program EIR" as "an EIR which may be prepared on a series of actions that can be characterized as one large project and are related either: [¶] (1) Geographically, [or ][¶] (2) As logical parts in the chain of contemplated actions." (Guidelines, § 15168, subd. (a).) As this court noted in *Natural Resources Defense Council, Inc. v. City of Los Angeles* (2002) 103 Cal.App.4th 268, 281–282 [126 Cal.Rptr.2d 615], a program EIR does not always suffice for a later project, which may require another form of EIR, including a "tiered" EIR.

[22] Regarding *Vineyard*, appellants' reply brief contends that Castaic's certification of the 2004 EIR raises the prospect of a legal conflict with DWR's pending Monterey Agreement EIR, should DWR disapprove the Monterey Agreement. However, for the reasons elaborated below (see pt. B.2.c., *post*), we see no potential for such a conflict, as the 2004 EIR analyzes the environmental impacts of the transfer, as implemented under both the pre- and post-Monterey Agreement contractual regimes.

b. *Lead Agency*

■ Appellants contend that DWR, not Castaic, is the appropriate lead agency to conduct a review of the Kern-Castaic transfer. Generally, "the lead agency plays a pivotal role in defining the scope of environmental review, lending its expertise in areas within its particular domain, and in ultimately recommending the most environmentally sound alternative." (*Planning and Conservation League, supra,* 83 Cal.App.4th at p. 904, quoting *Kings County Farm Bureau v. City of Hanford, supra,* 221 Cal.App.3d at pp. 736–737.) Appellants contend that Castaic lacks the requisite expertise, as the 2004 EIR relies on DWR's computer models regarding SWP water supplies in assessing the three scenarios relevant to the transfer (that is, the scenarios based on water allocations with and without the Monterey Amendments). In addition, they argue that DWR has superior expertise regarding the scenarios because they hinge on the implementation of the Monterey Agreement, for which DWR is conducting the environmental review. We disagree.

Under CEQA, when a project involves two or more public agencies, ordinarily only one agency can serve as the lead agency. (Guidelines, §§ 15050, 15051.) CEQA thus distinguishes lead agencies from responsible agencies: whereas the lead agency has "principal responsibility" for the project, a responsible agency is "a public agency, other than the lead agency, which has responsibility for carrying out or approving a project." (Pub. Resources Code, §§ 21067, 21069.) Regarding this distinction, the CEQA guidelines provide that when a project involves two or more public agencies, the agency "carr[ying] out" the project "shall be the lead agency even if the project [is] located within the jurisdiction of another public agency." (Guidelines, § 15051, subd. (a).)

Under these principles, courts have concluded that the public agency that shoulders primary responsibility for creating and implementing a project is the lead agency, even though other public agencies have a role in approving or realizing it. (*Eller Media Co. v Community Redevelopment Agency* (2003) 108 Cal.App.4th 25, 45–46 [133 Cal.Rptr.2d 324] [community agency charged with responsibility for redevelopment measures within designated area was lead agency regarding billboard placement, even though city issued building permits for billboards]; *Friends of Cuyamaca Valley v. Lake Cuyumaca Recreation & Park Dist.* (1994) 28 Cal.App.4th 419, 426–429 [33 Cal.Rptr.2d 635] [state agency that determined duck hunting policy, rather than wildlife district that enforced it, was lead agency regarding duck hunting policy]; *City of Sacramento v. State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 971–973 [3 Cal.Rptr.2d 643] [state agency that created pesticide pollution control plan, rather than water district that enforced it, was lead agency regarding plan].)

We agree with the trial court that Castaic, rather than DWR, has "carried out" the Kern-Castaic transfer within the meaning of CEQA (Guidelines, § 15051, subd. (a)).[23] As the trial court remarked, "[t]he . . . transfer is a project separate in time from the Monterey Amendments, now Monterey Plus. The core of the project is a local transfer of water between Castaic and Wheeler Ridge. Castaic alone had the responsibility to determine the water needs of its service area and to obtain the necessary water for those needs. Castaic negotiated and entered into the transfer contract with Wheeler Ridge. Castaic performed the contract by obtaining private investors who paid . . . [for] Wheeler Ridge's water, and by taking delivery from DWR." As the trial court noted, the fact that DWR has approved the transfer and supplies the water does not make it the lead agency, as DWR is obliged by statute to facilitate such transfers (Wat. Code, § 109).

We see no error in the trial court's determinations, which establish that Castaic is better positioned than DWR to assess the environmental impact of the transfer. Although DWR approved the transfer and cooperates in its implementation by supplying water (and information about water supplies), Castaic is the project's prime mover. Moreover, because Wheeler Ridge would receive the underlying water from the Delta in the absence of the transfer, the transfer's principal impacts tend to fall within Castaic's service area. In addition, as explained above (see pt. B.2.a., *ante*), the fact that DWR is preparing the Monterey Agreement EIR does not preclude Castaic from reviewing the transfer, despite its relationship to the Monterey Amendments. Indeed, DWR, which is charged with the preparation of the Monterey Agreement EIR, agrees that Castaic is the correct lead agency for the transfer.

*Planning & Conservation League*, relied upon by appellants, does not hold otherwise. There, the appellate court concluded that DWR's "statewide perspective and expertise" as manager of the SWP made it the "logical choice" to assess the environmental impacts of the Monterey Agreement, which affects the SWP as a whole. (*Planning and Conservation League, supra*, 83 Cal.App.4th at pp. 906–907.) In contrast, Castaic's preeminent role regarding the transfer renders it the logical choice for lead agency, in view of the transfer's confined scope.

#### c. *Significance of the Pending Monterey Agreement EIR*

Appellants contend that the 2004 EIR's project definition improperly represents the transfer as a fait accompli prior to adequate CEQA review. The 2004 EIR states that the project "currently is being implemented by an

---

[23] None of the parties disputes that Castaic and DWR are public agencies within the meaning of CEQA. (See *Planning & Conservation League, supra*, 83 Cal.App.4th at pp. 903–907.)

amendment to the SWP water supply contracts of [Castaic] and [Kern] executed in 1999"; that the transfer was "contractually completed in 1999"; and that "[n]o permits and other approvals would be required other than the certification of this EIR." Pointing to these statements, appellants argue that the 2004 EIR improperly describes the transfer as final, despite its relationship to the outcome of DWR's assessment of the Monterey Agreement.[24] For the reasons explained below, we reject their contention.[25]

 Generally, " '[t]he ultimate decision of whether to approve a project, be that decision right or wrong, is a nullity if based upon an EIR that does not provide the decision-makers, and the public, with the information about the project that is required by CEQA.' [Citation.]" (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 721–722 [32 Cal.Rptr.2d 704], quoting *Santiago County Water Dist. v.*

---

[24] Appellants also challenge the trial court's determination that the Kern-Castaic transfer is, in fact, "final as a matter of law." On this question, the trial court concluded that CEQA accords DWR no authority to invalidate the Kern-Castaic transfer through DWR's review of the Monterey Agreement, although DWR's Monterey Agreement EIR may lead to mitigation measures affecting the amount of water available for the transfer. As we "review[] the agency's action, not the trial court's decision" (*Vineyard, supra*, 40 Cal.4th at p. 427), we limit our inquiry to whether the 2004 EIR contains material misrepresentations or omissions regarding the implications of DWR's pending EIR for the transfer. As explained below, the 2004 EIR adequately acknowledges the uncertainties created for the transfer by DWR's pending EIR, including the possible restoration of the pre-Monterey Agreement contractual regime. To provide sufficient information on this matter, the 2004 EIR need not speculate on how DWR's pending EIR Agreement might ultimately affect the Monterey Amendments.

[25] Respondents contend that the doctrine of collateral estoppel precludes CWIN from joining in this contention. We disagree. "Collateral estoppel may bar the relitigation of an issue decided in a previous proceeding if (1) the issue necessarily decided at the previous proceeding is identical to the one sought to be relitigated; (2) the previous proceeding resulted in a final judgment; and (3) the party against whom collateral estoppel is sought was a party to or in privity with a party to the previous proceeding." (*In re Bush* (2008) 161 Cal.App.4th 133, 145–146 [74 Cal.Rptr.3d 256].)

In *Sierra Club v. City of Santa Clarita* (Jan. 29, 2008, B194771) (nonpub. opn.) (*Sierra Club*), CWIN unsuccessfully challenged an EIR for a real estate development whose water supply derives from the Kern-Castaic transfer. The EIR closely resembled an EIR addressed in another case to which CWIN was not a party, namely, *Santa Clarita Organization for Planning the Environment v. County of Los Angeles* (2007) 157 Cal.App.4th 149, 152 [68 Cal.Rptr.3d 449] (*SCOPE*), which we discuss below. Each court concluded that the pertinent EIR adequately disclosed the legal uncertainties attending the transfer. (*Sierra Club, supra*, B194771; *SCOPE, supra*, 157 Cal.App.4th at pp. 156–157.)

Although *Sierra Club* is unpublished and has no precedential value, we take judicial notice of it for purposes of assessing its relevance under the doctrine of collateral estoppel. (Cal. Rules of Court, rule 8.1115(b)(1).) In our view, the differences between the EIR at issue in *Sierra Club* and Castaic's 2004 EIR preclude application of the doctrine. Nonetheless, for the reasons explained below, we find guidance on appellants' contention from the published opinion in *SCOPE*, viewed as a precedent. (See *Pajaro Valley Water Management Agency v. Amrhein* (2007) 150 Cal.App.4th 1364, 1377, fn. 7 [59 Cal.Rptr.3d 484] [prior decision may have precedential value even when doctrine of collateral estoppel is inapplicable].)

*County of Orange* (1981) 118 Cal.App.3d 818, 829 [173 Cal.Rptr. 602].) Under CEQA's standards for the adequacy of EIR's, an EIR must "be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences." (Guidelines, § 15151.) When an agency preparing an EIR is obliged to examine future events that are difficult to forecast, the agency "must use its best efforts to find out and disclose all that it reasonably can." (Guidelines, § 15144.) To the extent an EIR addresses controversial matters implicating expertise, the EIR "should summarize the main points of disagreement." (Guidelines, § 15151.)

In examining an EIR under these standards, we "look[] not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (Guidelines, § 15151; see *Laurel Heights, supra,* 47 Cal.3d at p. 406.) "Our role . . . , as a reviewing court, is not to decide whether [the agency] acted wisely or unwisely, but simply to determine whether the EIR contained sufficient information about a proposed project, the site and surrounding area and the projected environmental impacts arising as a result of the proposed project or activity to allow for an informed decision . . . ." (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus, supra,* 27 Cal.App.4th at p. 718.)

When an EIR omits information, "[t]he relevant inquiry is whether there has been 'a prejudicial abuse of discretion.' [Citation.] The absence of information in an EIR 'does not per se constitute a prejudicial abuse of discretion. [Citation.] A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process. [Citation.]' [Citation.] There is 'no presumption that error is prejudicial.' [Citation.]" (*Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 748 [22 Cal.Rptr.2d 618].)

In *SCOPE, supra,* 157 Cal.App.4th 149, the appellate court addressed an issue similar to that before us. There, the County of Los Angeles certified an EIR for a real estate development project whose water supply derived from the Kern-Castaic transfer. (*Id.* at pp. 152–153.) The EIR described the legal history surrounding the Monterey Agreement and the transfer through to the Monterey Plus settlement agreement; characterized the transfer as a "permanent acquisition" of water; and asserted that the transfer could have occurred in the absence of the Monterey Agreement. (*Id.* at pp. 155–156.)

The EIR further stated: " 'Although [Castaic is] not a party [to the Monterey Agreement EIR litigation], an adverse final judgment invalidating the Monterey Agreement could affect [Castaic's] completed acquisition of the

41,000 [acre-feet], which could in turn impair [Castaic's] supply of SWP water through its contracts with DWR and other SWP contractors. Nevertheless, [Castaic] believes that an adverse outcome in the Monterey Agreement litigation is not likely to adversely affect [Castaic's] water supplies over the long-term because (a) [Castaic] believes that such a result is unlikely to "unwind" executed and completed agreements with respect to the permanent transfer of SWP water amounts; (b) existing SWP water supply contract provisions allow such transfers (without the need for the Monterey Agreement); and (c) existing law enables [Castaic] to enter into contracts outside the context of the Monterey Agreement.' " (*SCOPE, supra*, 157 Cal.App.4th at pp. 155–156.)

The court in *SCOPE* rejected the contention that the EIR inadequately disclosed the extent to which the transfer was "not final and permanent." (*SCOPE, supra*, 157 Cal.App.4th at pp. 156–157, 160.)[26] The court stated: "[T]he EIR discloses that the Monterey Agreement litigation makes the Kern-Castaic transfer legally uncertain. The EIR states that a judgment invalidating the Monterey Agreement could affect Castaic's acquisition of the 41,000 acre feet of water. The EIR concludes, however, that as a practical matter an adverse outcome in the Monterey Agreement litigation is unlikely to 'unwind' the transfer agreement. . . . [T]his conclusion is supported by reasoned analysis. The EIR points out that the Kern-Castaic transfer is intended to be permanent, and that the transfer can be valid even without the Monterey Agreement." (*SCOPE, supra*, 157 Cal.App.4th at p. 160.)

We find *SCOPE* persuasive on the issue before us. Although *SCOPE* addressed an EIR for a project dependent on the Kern-Castaic transfer, rather than the transfer itself, CEQA ordinarily requires greater specificity regarding future water supplies as land use planning moves from general to specific phases. (See *Vineyard, supra*, 40 Cal.4th at pp. 433–434.) Moreover, the 2004 EIR resembles the EIR in *SCOPE*.

---

[26] In addressing this contention, the court applied four principles identified in *Vineyard* regarding EIR's that analyze future water supplies. (*SCOPE, supra*, 157 Cal.App.4th at pp. 158–159.) First, CEQA's informational purposes are not satisfied by an EIR that "simply ignores or assumes a solution to the problem of supplying water . . . ." (*Vineyard, supra*, 40 Cal.4th at pp. 430–431.) Second, the EIR must address the issue of supplying water over the life of the project. (*Id.* at p. 431.) Third, "the future water supplies identified and analyzed must bear a likelihood of actually proving available; speculative sources and unrealistic allocations ('paper water') are insufficient bases for decisionmaking under CEQA." (*Id.* at p. 432.) Fourth, when, "despite a full discussion," the agency cannot determine with confidence that the anticipated water supplies will be available, the EIR must identify alternative sources and discuss their environmental impact. (*Ibid.*) The EIR may also contemplate the project's curtailment to resolve a water shortage, provided that the EIR makes "a sincere and reasoned attempt to analyze the water sources the project is likely to use, but acknowledges the remaining uncertainty." (*Ibid.*)

The 2004 EIR describes the pertinent legal history, states the transfer was "contractually completed in 1999," and asserts that the transfer could have been implemented under the contractual regime in existence before the Monterey Agreement. The EIR also acknowledges the legal uncertainty regarding the actual contractual basis for the transfer, that is, the contractual regime implemented under the Monterey Agreement. The EIR states that the Monterey Amendments are the subject of continuing litigation, and that DWR is in the process of preparing a new EIR concerning them. Moreover, it explains in a section entitled "Areas of Known Controversy": "The present EIR . . . examines environmental impacts that would occur *with and without* the change in water allocation criteria implemented as part of the Monterey Amendment[s]. Although the Monterey Amendment[s] continue[] in operation under the [Monterey Plus settlement agreement], this EIR evaluates a *reasonable worst-case scenario of SWP operations without the Monterey Amendment[s]*." (Italics added.)

Finally, the 2004 EIR concludes that the transfer will continue *regardless* of the outcome of DWR's review of the Monterey Agreement, as it underscores that the parties have implemented the transfer since 1999, and analyzes future water supplies available through the transfer under the pre- and post-Monterey Agreement contractual regimes. Although the 2004 EIR, unlike the EIR in *SCOPE*, does not expressly state that the outcome of DWR's review is "unlikely to 'unwind' " the transfer, its discussion unmistakably conveys this conclusion, as it characterizes implementation of the transfer without the Monterey Amendments as the "worst-case scenario" for the transfer (*SCOPE, supra*, 157 Cal.App.4th at p. 156).

Pointing to *California Oak Foundation v. City of Santa Clarita* (2005) 133 Cal.App.4th 1219 [35 Cal.Rptr.3d 434] (*California Oak*), appellants contend that the 2004 EIR improperly assumes that the transfer will continue, notwithstanding the result of DWR's Monterey Agreement EIR. We disagree. In *California Oak*, the City of Santa Clarita certified an EIR for an industrial park whose water supply derived from the Kern-Castaic transfer. (*Id.* at pp. 1224–1225.) The body of the EIR did not mention that Castaic's 1999 EIR had been decertified, and did not address the fact that the actual amount of water delivered through the transfer could differ from the 41,000 acre-feet specified in the underlying contracts; the sole references to these matters were some scattered and cursory remarks (primarily in an appendix). (*Id.* at pp. 1236–1241.) The appellate court concluded that the EIR was defective for want of an adequate discussion of the legal uncertainties surrounding the transfer and the so-called "paper water" issue. (*Ibid.*) Here, unlike the EIR in *California Oak*, the 2004 EIR adequately discusses these issues in its body and appendices.

Appellants contend that the 2004 EIR conceals or misrepresents several items of information. They suggest that the EIR, in asserting that the transfer is subject to no further approvals other than certification of the EIR itself, conceals the necessity for DWR's approval of the Monterey Agreement under CEQA. However, the statement in the EIR, viewed in context, is accurate: as we have explained (see pt. B.2.a., *ante*), the transfer is a separate project from the Monterey Agreement. The EIR otherwise adequately discloses that DWR's environmental review of the Monterey Agreement may ultimately affect the contractual regime under which the transfer occurs.

Appellants contend that the 2004 EIR inadequately discloses that DWR, in preparing the Monterey Agreement EIR, may reach "different conclusions" regarding the availability of SWP water for the transfer. As we elaborate below (see pt. B.2.f., *post*), the 2004 EIR relies on DWR water supply studies based on a hydrological computer model that predates DWR's current model. Attached to the 2004 EIR is a comment letter from DWR that concludes that the EIR "adequately discusses the reliability of the SWP, pre- and post-Monterey Amendment conditions, future conditions, and SWP operations." In addressing the pending Monterey Agreement EIR, DWR notes its adoption of the new computer model, and states: "The use of [the new model] may cause slight changes in results, which may lead DWR to different conclusions than the conclusions made by [Castaic] in the [2004 EIR]."

In *SCOPE*, the appellate court rejected a nearly identical contention in assessing whether the EIR at issue adequately discussed the uncertainties surrounding the Kern-Castaic transfer. (*SCOPE, supra*, 157 Cal.App.4th at p. 161.) Regarding DWR's comment letter, the court stated: "[T]he letter describes any possible change in result as 'slight.' The letter does not state that the slight change in results will probably lead to different conclusions; it says only that it 'may' lead to unspecified different conclusions. It is highly improbable that a slight change in results will lead to radically different conclusions. In fact, the letter praises the draft EIR's discussion of the proposed project and its impacts. The information contained in the letter adds nothing substantial to . . . [the] EIR." (*Ibid.*) We reach the same conclusion here.

Appellants suggest that the 2004 EIR fails to discuss the potential impact of implementing the transfer under the pre-Monterey Agreement contractual regime. They maintain that the EIR contains no analysis of the impact of the "agriculture first" water reduction provisions of article 18(a) on the transfer; in addition, they argue that the assumption that the transfer would continue (if necessary) under the pre-Monterey Agreement contractual regime amounts to an improper reliance on "paper water," that is, on contractual entitlements to water, rather than realistic estimates of water supplies. These contentions fail,

as the EIR addresses the impact of article 18(a) in analyzing the three scenarios relevant to the transfer, and evaluates the actual water supplies available under the scenarios.

Finally, appellants observe that the 2004 EIR does not disclose that one of the contracts underlying the transfer acknowledges that the Monterey Agreement EIR litigation has potential significance for the transfer.[27] Although appellants are correct, we do not regard the omission as prejudicial, as the EIR evaluates the "reasonable worst-case scenario" for the transfer, as initiated in 1999, namely, that of SWP operations *without* the Monterey Amendments. (*Schaeffer Land Trust v. San Jose City Council* (1989) 215 Cal.App.3d 612, 631 [263 Cal.Rptr. 813] [minor omission in EIR's discussion is not prejudicial when EIR "comprehensively, if not perfectly, analyzed the issue"].)

### d. *"No Project" Alternative*

Appellants challenge the 2004 EIR's discussion of the "no project" alternative, arguing that the EIR must assess the environmental impact of the absence of the transfer under the pre-Monterey Agreement contractual regime. We disagree.

Under CEQA, "[t]he purpose of describing and analyzing a [']no project['] alternative is to allow decisionmakers to compare the impacts of approving the proposed project with the impacts of not approving the proposed project." (Guidelines, § 15126.6, subd. (e)(1).) In addressing the "no project" alternative, the EIR must "discuss the existing conditions at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, as well as what would be reasonably expected to occur in the foreseeable future if the project were not approved, based on current plans and consistent with available infrastructure and community services." (Guidelines, § 15126.6, subd. (e)(2).) As an EIR need not consider "an alternative whose effect cannot be reasonably ascertained and whose implementation is remote and speculative" (Guidelines, § 15126.6, subd. (f)(3)), an EIR is not obliged to examine "every conceivable variation" of the "no project" alternative (*Residents Ad Hoc Stadium Com. v. Board of Trustees* (1979) 89 Cal.App.3d 274, 286–288 [152 Cal.Rptr. 585]).

As the court explained in *Planning & Conservation League*, "[a] no project description is nonevaluative. It provides the decision makers and the

---

[27] In a section entitled, "Representations and Warranties," the Wheeler Ridge-Castaic contract states that "other than [the litigation regarding the 1995 Monterey Agreement EIR], there currently is no litigation or governmental proceeding pending, threatened or implied with respect to the ownership, use or transfer of [the pertinent water supply entitlements]."

public with specific information about the environment if the project is not approved. It is a factually based forecast of the environmental impacts of preserving the status quo. It thus provides the decision makers with a base line against which they can measure the environmental advantages and disadvantages of the project and alternatives to the project." (*Planning & Conservation League, supra*, 83 Cal.App.4th at pp. 917–918.)

Here, the 2004 EIR describes the "no project" alternative as the situation in which Castaic would obtain neither the 41,000 acre-feet of water nor the contractual rights to it. Although the EIR notes that this alternative could be enlarged to cover the possibility that the water is "acquired and transferred to other portions of urbanized California," the EIR declines to address the potential transfer as "highly speculative." The EIR explores only two variants of the "no project" alternative: the first assumes a moratorium on new property development, and the second assumes restricted development.

Appellants contend that Castaic was obliged to examine another variation of the "no project" alternative, namely, the possibility that Castaic does not acquire the rights to the 41,000 acre-feet of water *and* the pre-Monterey Agreement contractual regime is restored. In rejecting this contention, the trial court stated: "The short answer . . . is that the 2004 EIR addresses a different project [from the Monterey Agreement EIR]. The 'no project' alternative for any EIR requires a comparison of the impacts of approving the project with the effect of not doing so. [Citations.] The only 'no project alternative' that Castaic is obligated to consider is the alternative of 'no Kern water transfer.' Castaic has addressed this alternative. . . . But Castaic had no obligation to consider 'no Monterey Amendments' as a [']no project['] alternative."

We agree with the trial court. The status quo for the assessment of the transfer encompasses the currently effective contractual regime, namely, the regime implemented under the Monterey Agreement. The EIR examines two variants of the "no project" alternatives reasonably related to the absence of the 41,000 acre-feet of water involved in the transfer, namely, measures that could be taken to accommodate the absence of the water. These variants "provide[] the decision makers with a base line against which they can measure the environmental advantages and disadvantages of the [transfer] and alternatives to the project." (*Planning & Conservation League, supra*, 83 Cal.App.4th at pp. 917–918.)

In our view, CEQA does not also require the 2004 EIR to examine the joint impact of the absence of the water from the transfer *and* the restoration of the pre-Monterey Agreement contractual regime. As explained above (see pt. B.2.a. & b., *ante*), the transfer and the Monterey Agreement constitute

different projects under CEQA, and only the transfer is subject to Castaic's approval. As we have also explained (see pt. B.2.c., *ante*), the EIR adequately states that the transfer, if chosen, faces some uncertainty due to DWR's pending Monterey Agreement EIR, but that the transfer is likely to continue regardless of DWR's CEQA review. However, for purposes of Castaic's decision to approve the project, the uncertainty DWR's review creates for the baseline against which the transfer's merits can be assessed—namely, Castaic's water supply, as it would exist *in the absence of the transfer*—appears to be "remote and speculative" (Guidelines, § 15126.6, subd. (f)(3)).

*Planning & Conservation League*, upon which appellants rely, is inapposite. There, the appellate court held that DWR must assess the implementation of the permanent water reduction provisions of article 18(b), under the "no project" alternative in its Monterey Agreement EIR. (*Planning & Conservation League, supra*, 83 Cal.App.4th at pp. 912–920.) As DWR is examining a different project, this holding provides no guidance on the issue before us.

### e. *Alternatives to Project*

Appellants contend that the 2004 EIR does not examine a reasonable range of alternatives to the Kern-Castaic transfer. They identify no specific alternatives improperly omitted from the EIR; rather, they argue that because only DWR may properly conduct the environmental review of the transfer, DWR would identify a different range of alternatives regarding the transfer. As we reject the premise of this contention (see pt. B.2.a. & b., *ante*), we also reject the contention.

### f. *Hydrological Models*

Appellants contend that the 2004 EIR improperly relies on outmoded and unreliable hydrological models to determine the amount of SWP water available for the transfer. As our Supreme Court has explained, when a reviewing court assesses studies that underlie an EIR, "the issue is not whether the studies are irrefutable or whether they could have been better. The relevant issue is only whether the studies are sufficiently credible to be considered as part of the total evidence that supports the [EIR's] finding[s]." (*Laurel Heights, supra*, 47 Cal.3d at p. 409, italics deleted.) Under these principles, we discern no error.

The 2004 EIR states that it evaluated SWP water supplies on the basis of two studies that DWR conducted in 1998 using a computer model known as "DWRSIM" (Department of Water Resources Simulation Model). After the

studies were completed, DWR developed a new computer model known as "CALSIM I," and later, another model known as "CALSIM II," which DWR employed in 2003 to reassess SWP water supplies. In preparing the 2004 EIR, Castaic relied on the DWRSIM studies, as CALSIM I was then undergoing revisions. Once CALSIM II was finalized, Castaic compared the 1998 studies with the results from CALSIM II. Although the supply estimates from the 1998 studies diverged in some respects from the CALSIM II results, Castaic concluded that the discrepancies largely reflected the different baselines for "existing demand" built into the models, rather than significant disparities in predicted supplies. Castaic also concluded that its assessment of the transfer's environmental impacts would remain unchanged if it were to rely on the CALSIM II results.

Appellants contend that the divergent supply estimates in the 1998 studies and 2003 CALSIM II results are significant and inadequately explained in the EIR. However, as the trial court noted, the body of the EIR and its appendices adequately discuss the divergences, which appear to be minimal in view of the differences in modeling assumptions. We agree with the trial court.

## g. *Cumulative Impacts*

Appellants contend that the 2004 EIR's assessment of the transfer's cumulative impacts on the Delta is defective. They argue that the EIR contains only a conclusory examination of the transfer's impact on the Delta resulting from the timing of water withdrawals under the transfer. On this matter, the EIR acknowledges that "[t]he difference in timing of water used for urban purposes rather than agricultural purposes would result in a slight change in timing of deliveries of the 41,000 [acre-feet] of Table A [water]." The EIR further explains that these differences "fall well within the range of historical and future anticipated SWP diversions from the Delta," points to evidence that the changes in question are minor, and concludes that the resulting impacts "would be less than significant." We see no deficiency in this discussion.

## 3. *Cross-appellants' Contention*

We turn to cross-appellants' challenge to the trial court's determination that the 2004 EIR contains a material defect. Under CEQA, an EIR must generally disclose the " 'analytic route the . . . agency travel-ed from evidence to action.' " (*Laurel Heights, supra,* 47 Cal.3d at p. 404, quoting *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12].) To establish the requisite analytic route, " 'the EIR must contain facts and analysis, not just the agency's bare conclusions or

opinions.' " (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 568 [276 Cal.Rptr. 410, 801 P.2d 1161].)

Here, the trial court's statement of decision asserts: "[Appellants] are correct that the EIR has a hole in it. The EIR does not directly explain that the project may be impacted by the outcome of the Monterey Amendments EIR. Instead, the . . . EIR assumes there are three possible water delivery scenarios without any discussion of why or how they would occur. . . . The reader is left to interpret how these allocations could come about, and must conclude on his or her own that they are three possible outcomes of challenges to the Monterey Amendments. Nor does the EIR explain how such challenges could cause these allocations to occur." The court concluded that because the EIR's failure to supply the analytical route for the consideration of the three scenarios was an omission "affecting the public's ability to make a 'meaningful assessment' of the project's environmental effects," the deficiency was prejudicial.

We reach a different conclusion. As explained below, we conclude that the 2004 EIR is not subject to challenge on the ground found by the trial court, as appellants failed to assert it prior to the trial court's ruling. Additionally, we conclude that even if cognizable, the challenge fails.

■ Absent circumstances not present here here, "CEQA prohibits a petitioner or appellant from alleging noncompliance with the requirements of CEQA unless the alleged grounds for noncompliance were presented to the public agency either orally or in writing by any person during the public comment period or during the hearing on project approval. [Citations.] When a ground of noncompliance with CEQA was not raised during the comment period or during the public hearing on project approval, the right to raise the issue in a subsequent legal action is waived. The petitioner bears the burden of demonstrating that the issues raised in the judicial proceeding were first raised at the administrative level. [Citation.] '[T]he objections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them.' [Citation.] This requirement is known as the exhaustion doctrine. [Citation.] The rationale behind this rule is that the public agency should have the opportunity to receive and respond to articulated factual issues and legal theories before its actions are subjected to judicial review. [Citation.]" (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 909–910 [69 Cal.Rptr.3d 105], quoting *Evans v. City of San Jose* (2005) 128 Cal.App.4th 1123, 1136, 1140 [27 Cal.Rptr.3d 675].)

■ Appellants contend that their objections during the public comment period targeted the specific defect that the trial court identified in the EIR. We

disagree. To satisfy the exhaustion doctrine, the objections must "fairly apprise[]" the agency of the purported defect in the EIR. (*Save Our Residential Environment v. City of West Hollywood* (1992) 9 Cal.App.4th 1745, 1750 [12 Cal.Rptr.2d 308].) During the comment period, appellants objected to the section of the draft EIR describing the Monterey Plus settlement agreement as "piecemeal and startlingly inaccurate," and asserted that *the section* "fail[ed] even to inform the reader that DWR's . . . review of the 'Monterey Plus' project could affect the future of this transfer or of the Monterey Amendments themselves." In addition, appellants contended that Castaic's failure to await the outcome of DWR review rendered the Kern-Castaic transfer a fait accompli, and impaired Castaic's assessment of the transfer's environmental effects.

None of these objections attacked the adequacy of the analytic route drawn in the EIR between the pending DWR Monterey Agreement EIR and the water delivery scenarios. Although appellants' first objection questioned whether a portion of the EIR properly acknowledged the relevance of DWR's review to the Kern-Castaic transfer, the objection sought only an admission that DWR's review "could affect" the transfer in some manner. As appellants acknowledge, they never specifically objected to the EIR's discussion of the scenarios. Accordingly, the objection did not fairly apprise Castaic that the EIR did not adequately explain the connection.[28]

We reject appellants' contention that cross-appellants forfeited their argument based on the exhaustion doctrine by failing to assert it before the trial court. Generally, such an argument is forfeited when not raised in a timely manner. (*Sacramento County Deputy Sheriffs' Assn. v. County of Sacramento* (1990) 220 Cal.App.3d 280, 286 [269 Cal.Rptr. 6].) Here, however, the trial court's determination that appellants had, in fact, identified an analytic gap in the EIR first appeared in the statement of decision, with no prior briefing on the purported gap. Because the exhaustion doctrine raises a question of law that we examine de novo (*Anthony v. Snyder* (2004) 116 Cal.App.4th 643, 654 [10 Cal.Rptr.3d 505]), the trial court's determination constitutes an error of

---

[28] Although appellants' briefs acknowledge that they never specifically objected to the EIR's discussion of the scenarios, they contended otherwise during oral argument, pointing to a portion of one of their comment letters in which they argued: "Castaic's hypothetical 'non-Monterey' analysis of the transfers in the [2004] EIR cannot substitute for DWR's new assessment of the Monterey changes. . . . Although transfers were available under Article 41 of the pre-Monterey [Agreement] contracts subject to express DWR approval, DWR has neither reviewed nor conferred approval on the present transfer under Article 41. Moreover, it is highly speculative whether the agriculture-to-urban transfers such as the [Kern-Castaic] transfer would even have taken place without the Monterey Amendments . . . ." Nothing in this comment suggests that the 2004 EIR inadequately explains the analytic route from the Monterey Agreement EIR to the scenarios; on the contrary, the comment appears to recognize that "DWR's new assessment of the Monterey changes" is the reason the EIR discusses the scenarios.

law regarding the application of the doctrine. As cross-appellants were not obliged to object to the trial court regarding errors of law in the statement of decision, they have not forfeited their contention. (*Van Klompenburg v. Berghold* (2005) 126 Cal.App.4th 345, 348, fn. 3 [23 Cal.Rptr.3d 799] [party does not forfeit contention regarding erroneous legal conclusion by failing to object to statement of decision]; *United Services Auto. Assn. v. Dalrymple* (1991) 232 Cal.App.3d 182, 186 [283 Cal.Rptr. 330] [same].)

■ Additionally, we find the challenge fails on the merits. Generally, an EIR discloses the requisite analytic route when it provides "sufficient information and analysis to allow the public to discern the basis for the agency's [action]." (*Californians for Alternatives to Toxics v. Department of Food & Agriculture* (2005) 136 Cal.App.4th 1, 13 [38 Cal.Rptr.3d 638].) Under these standards, the 2004 EIR adequately explains why the three scenarios discussed in connection with the transfers are possible outcomes of DWR's pending Monterey Agreement EIR.

To inform the public about the CEQA process, the 2004 EIR states that it is an "informational document for decision-makers and the general public alike," and that Castaic, as the lead agency charged with its preparation, must "evaluate and if appropriate, . . . *approve* the [transfer]." (Italics added.) As explained above (see pt. B.2.c., *ante*), the 2004 EIR also states that the 1995 Monterey Agreement EIR was decertified; that the Monterey Amendments remain operative pursuant to the Monterey Plus settlement agreement pending the certification of a new Monterey Agreement EIR; that DWR has replaced Central Coast as the lead agency preparing the new EIR; and that the Monterey Amendments are an object of continuing litigation and an "[area] of [k]nown [c]ontroversy." The 2004 EIR further explains: "Although the Monterey Amendment[s] continue[] in operation under the [Monterey Plus settlement agreement], this EIR evaluates a reasonable worst-case scenario of SWP operations without the Monterey Amendment[s]." In addition, the 2004 EIR describes the relationship between the pre- and post-Monterey Agreement contractual requirements and the three water supply scenarios in considerable detail.

■ The 2004 EIR thus explains that a lead agency preparing an EIR is also responsible for approving the project; that DWR is the lead agency charged with the preparation of the new Monterey Agreement EIR; and that the outcome of DWR's pending EIR, though a matter of controversy, could lead—as a "worst case-scenario" for the Kern-Castaic transfer—to the restoration of the pre-Monterey Agreement contractual regime. Although we agree with the trial court that the 2004 EIR's discussion could have been clearer, " '[a]bsolute perfection' " is not required of an EIR (*Laurel Heights, supra,* 47 Cal.3d at p. 406). When, as here, an EIR must address controversial matters

that resist reliable forecasting, CEQA requires only that the agency "use its best efforts to find out and disclose all that it reasonably can" (Guidelines, § 15144), and that the EIR display "adequacy, completeness, and a good faith effort at full disclosure" (Guidelines, § 15151). In our view, the 2004 EIR's discussion "bridge[s] the analytic gap" between DWR's Monterey Agreement EIR and the water supply scenarios. (*Topanga Assn. for a Scenic Community v. County of Los Angeles, supra*, 11 Cal.3d at p. 515.) Accordingly, we conclude the trial court erred in issuing the peremptory writ of mandate.

## DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court with directions to vacate the peremptory writ of mandate and issue a new judgment denying the petitions in their entirety. Castaic, Kern, Wheeler Ridge, and DWR are awarded their costs on appeal.

Epstein, P. J., and Willhite, J., concurred.

A petition for a rehearing was denied January 14, 2010, and the opinion was modified to read as printed above. The petition of plaintiffs and appellants for review by the Supreme Court was denied March 10, 2010, S179789.