Filed 4/12/22  In re L.P. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re L.P. et al., Persons Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOHN P.,<br><br>Defendant and Appellant. | F083382<br><br>(Super. Ct. Nos. JVDP-19-000193, JVDP-19-000194 & JVDP-19-000195)<br><br>**OPINION** |

### THE COURT*

APPEAL from orders of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Mara L. Bernstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Boze, County Counsel, and Lindy GiacopuzziRotz, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

\*        Before Franson, Acting P. J., Peña, J. and DeSantos, J.

At a Welfare and Institutions Code section 366.26[1] hearing, the juvenile court (1) terminated parental rights to John P.'s now eight-year-old son, L.P., and four-year-old daughter, M.P., and selected adoption as their permanent plan, and (2) continued his now six-year-old daughter, Li.P., in foster care, and suspended visits with her parents pending the next review hearing. On appeal from the order suspending his visits with Li.P., father contends the order must be reversed because there is insufficient evidence visits are detrimental to Li.P.'s physical or emotional well-being.[2] Finding no merit to father's contention, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The family (Alexis M. (mother), John P. (father), L.P. (son/sibling), Li.P. (daughter/sibling), and M.P. (daughter/sibling)), came to the attention of the Stanislaus County Community Services Agency (Agency) in April 2019, when it received a referral that mother's then four-year-old daughter, Li.P., told a mandated reporter the children's father sexually abused her. When interviewed by a social worker, Li.P. disclosed the sexual abuse. Mother appeared shocked by the disclosure, while father denied being aware of anyone sexual abusing her or that she disclosed any abuse. The family entered into a voluntary family maintenance agreement (family agreement) in which they stipulated father would remain out of the family home and would not be left with the children unsupervised. Father and Li.P. were referred to Parents United for services related to the sexual abuse allegations, and Li.P. was referred to weekly group therapy.

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

[2]     Mother filed a separate appeal from the order terminating parental rights over L.P. and M.P. Father states he is joining in mother's appeal, but he does not raise any independent contentions of error, asserting only that if we were to reverse the termination of mother's parental rights, we must reverse the termination of his parental rights. Father's assertion is moot, however, since we affirmed the order terminating mother's parental rights in *In re L.P.* (Feb. 23, 2022, F083330) [nonpub. opn.].

2.

Despite constant reminders of the family agreement, father was found at mother's home on three separate occasions and mother knowingly allowed him around the children. The children were placed in protective custody and the Agency filed a petition alleging they came within the provisions of section 300, subdivisions (b)(1), (d) and (j) based on father's sexual abuse of Li.P., mother's denial of the sexual abuse and her failure to protect Li.P. after disclosure, possible substance abuse by both parents, mother and father knowingly violating the family agreement, and marks and bruises that were found on the children. The girls were placed together in a foster home, while L.P. was placed in a separate foster home.

### *The Jurisdiction/Disposition Hearing*

The Agency's report for the jurisdiction/disposition hearing recommended mother receive reunification services but father be denied services. The parents had child welfare histories in Kansas and Missouri for neglect and lack of supervision or physical abuse. In the Kansas case, the two older children were removed in December 2016 due to lack of supervision, returned to mother's care in April 2017, and the case was closed in October 2017.

L.P., who was in kindergarten, displayed bullying and sexualized behavior at school and was found eligible for mental health services. Li.P., who was in transitional kindergarten, reportedly hit other children and was set to resume services through Parents United. She exhibited sexualized behaviors in the foster home and became violent in the home and with the care provider, who gave a 14-day notice. As a result, the girls were moved together to a new foster home. While M.P. did not need mental health services, she exhibited sexualized behavior in the foster home.

The parents were having supervised visits with the children. It was noted their parenting skills needed improvement, as they struggled to redirect the children when they misbehaved, and mother used guilt to try to control the children's behaviors. After Li.P. asked to no longer visit father, mother began visiting with Li.P. separately from the

3.

family.  Li.P. exhibited sexualized and aggressive behavior following visits with both parents and once told staff when she saw her parents, she wanted to kill herself, and on another occasion said she hated herself.  It was recommended father's visits be suspended until Li.P.'s mental health could be stabilized through individual counseling.  The children began weekly sibling visits in October 2019; the visits were going well, and no concerns were reported.

Mother completed the parenting program she began during the voluntary case and had an intake appointment for another program.  She was receiving services at Parents United.  Father was attending Parents United but continued to deny the abuse allegations.  He had not completed the intake appointment to begin therapeutic visits with Li.P., which were ordered on October 3, 2019.

The parties reached a stipulated resolution at the jurisdictional/disposition hearing on January 15, 2020.  The juvenile court found the petition true, removed the children from parental custody, and ordered reunification services for both parents.  Additional case notes submitted prior to the hearing stated a December visit between the siblings was "chaotic and out of control."  Li.P. instigated matters by repeatedly touching her brother's bottom and refusing to listen to the visitation supervisor.  The supervisor had to call coworkers to manage the situation, as Li.P. was defiant, running around, yelling, and showing poor physical boundaries which encouraged her siblings to follow suit.  The juvenile court ordered Li.P. to undergo "more intensive therapy."

### The Six-Month Review Hearing

At the July 2020 six-month review hearing, the juvenile court followed the Agency's recommendation to continue the parents' services.  At the time the children were in individual placements separate from each other.  L.P. completed kindergarten and was doing better although he still displayed some bullying behaviors.  He was attending bi-weekly mental health counseling sessions.  Li.P. completed transitional kindergarten and her behavioral incidents were subsiding.  She was attending bi-weekly counseling

sessions, but her Parents United group was cancelled in March 2020 due to the Covid-19 pandemic. Li.P. was doing well in her new placement; she was no longer having tantrums, anger problems, or screaming. M.P. was showing behavioral challenges that included daily tantrums, and she was scheduled for a new mental health assessment.

Mother was ordered weekly supervised visits with the children, while father was ordered weekly supervised visits with L.P. and M.P. and weekly therapeutic supervised visits with Li.P. at Sierra Vista. The parents were consistent with these visits. Due to the Covid-19 pandemic, in-person visits at the Agency were suspended; instead, visits were conducted by video chat. Father had seven therapeutic supervised visits with Li.P. between December 2019 and March 9, 2020, when the visits were placed on hold due to the pandemic. The visitation supervisors noted Li.P. appeared comfortable with father, who was attentive and caring toward her. At one visit Li.P. asked father if he could "not do what you did at your house because now I am in foster home and I miss you guys," and at another, "why did you make me do that thing at the house for me to not be with you?" Each time, father redirected Li.P. to an activity. After therapeutic visits were suspended, the Agency provided father video chat visits with Li.P., which her siblings also attended.

### The 12-Month Review Hearing

In the Agency's 12-month review report, the Agency recommended services continue for both parents and the juvenile court grant the Agency discretion to begin a trial visit at mother's home. L.P. was attending his first-grade class via distance learning and was still in mental health counseling. Li.P.'s Parents United group resumed in August 2020, and she was continuing with bi-monthly mental health counseling. L.P. and M.P. were doing well in their homes, but Li.P. continued to have behavioral issues. She threw tantrums, tormented the other foster child, and ran from the care provider, who gave a 14-day notice. Li.P. changed placements again in September 2020.

Mother, who had separated from father, now believed Li.P. and felt guilty about not accepting her disclosure.  While father recognized Li.P. had been molested, he continued to deny he molested her.

Mother and father continued to consistently visit the children.  Due to the pandemic, they were restricted to video chat visits from June 12 through September 4, 2020, except for July and August, when each parent received one separate in-person visit each month.  Father's therapeutic visits with Li.P. had not resumed because he failed to attend group and individual therapy required by Parents United.  The children had to be transported separately to visits because they were physically forceful with each other.

In assessing the current situation, the social worker noted that while the parents were cooperative and engaged in services, and they consistently visited the children, "visiting is not parenting."  Neither parent made themselves available for the child family team meetings to discuss the children's needs or taken responsibility for why the children came to the Agency's attention.

At the 12-month review hearing in October 2020, the juvenile court continued services for both parents and granted the Agency discretion to begin a trial visit with mother only, which the social worker could terminate if necessary.  The juvenile court set an 18-month review hearing for February 5, 2021.[3]

### The February 2021 18-Month Review Hearing

In its report for the 18-month review hearing, the Agency recommended termination of father's services, continuation of mother's services, and a 90-day continuance of the hearing to assess mother during the trial visit with M.P., which began on December 18, 2020, and to allow the older children, who remained in separate foster homes, to begin trial visits with mother.

---

[3]  Further references to dates are to the year 2021, unless otherwise stated.

6.

While L.P. continued to receive mental health counseling and behaved aggressively toward other children in the foster home, his foster parents were committed to keeping him and chose to have other children in the home removed. Li.P. continued in individual counseling and Parents United, where they were working on her aggression and lack of boundaries. Li.P. had bonded with her current care providers, but she continued to have problems getting along with other children in the home and had episodes of tantrums and aggression. M.P. was found eligible for mental health services and she began a group for toddlers. Mother was overwhelmed at the beginning of the trial visit with the transition and M.P.'s high needs, but the social worker believed she was committed to M.P.'s needs.

The social worker opined there continued to be detriment to the children if they were returned to either parent. There was no likelihood father could reunify with the children, as he had not made substantive progress in his services. His visits with the children had been sporadic. His weekly therapeutic visits with Li.P. resumed in October 2020, which meant she no longer was visiting with her siblings, but the therapeutic visits had been inconsistent since father was not consistently attending group sessions that were required for a therapeutic visit to occur—he had two therapeutic visits in October, none in November, one in December and one in January.

Father was appropriate during the therapeutic visits and the visits went well, but Li.P. continued to confront father about him abusing her. At an October 20, 2020 visit, when Li.P. asked him why he "put his pee pee in her mouth," father looked to the counselor for direction in answering, as he previously had been instructed to redirect Li.P. when she asked such questions. The counselor told him he could address this with Li.P., which they had practiced; John then told Li.P. that it was not okay for him to do that. The therapist noted father was careful to not deny that it happened but rather to say this behavior is not okay, which is how he needed to respond regardless of whether he admitted to the conduct. The therapist reported that session went well and Li.P. did not

want the visit to end. By the next week, however, father's therapeutic visits were put on hold as he missed three group sessions in a row. Li.P. was struggling in group therapy sessions—she was very angry and acted out.

Father was able to reinstate the therapeutic sessions, which required paying a fee and meeting with the director, by the beginning of December 2020, and while he was attending groups, he was struggling "with being confronted by his peers and does not want to be a part of the group in that manner." Father attended an individual therapy session and therapeutic visitation in January but missed a group session. Li.P was doing very well in group sessions, and during visits, she continued to confront father about him abusing her. The counselor commented father seemed to be "checking out of services" because he believed mother would reunify. Nevertheless, father was always on time for therapeutic visits, he brought proper games and activities to engage his daughter, and when he was unsure of proper responses, he sought support from the clinician and took supportive direction well, answering his daughter's questions and concerns appropriately. While father recognized Li.P. had been molested, he continued to deny he molested her. The Agency recommended father receive monthly supervised visits.

Mother had made progress in her services; she stayed engaged and was consistent with visits and attending services. The family continued to partially visit via Zoom into November 2020. The social worker stated that while mother struggled with M.P. and was overwhelmed at the beginning of the trial visit, she would be starting a trial visit with the older children soon. The social worker believed reunification could be achieved if mother continued to make good progress and demonstrate she could safely parent the children and be protective of them.

Neither parent appeared at the February 5 review hearing. The juvenile court found it would be detrimental to return the children to either parent, the parents had been offered and provided reasonable services, there was not a substantial probability the children would be returned to father's custody but there was a substantial probability they

would be returned to mother's custody, and mother had made significant progress in resolving the problems that led to removal. The juvenile court terminated father's reunification services but continued mother's services.

On the issue of father's visits, the Agency told the juvenile court it was willing to give father weekly visits which, due to Covid, would consist of two in-person visits and two Zoom visits at the Agency. Father's attorney, who had spoken to father, stated it had been difficult for him to navigate the situation because he denied the allegations but was still trying to support Li.P. as best he could. Father wanted to continue with therapeutic visits, as he found they helped him support Li.P., but the Agency made clear that because he was no longer being offered services, those visits would have to be on his own. Father wanted in-person visits, but his attorney believed he would be amenable to having some Zoom visits with the understanding in-person visits could increase over time.

The children's attorney was concerned about father's continued contact with the children, noting that in therapeutic visits with Li.P., the minute she started confronting him about the abuse he seemed to disengage and did not want to take part anymore. The children's attorney was concerned that father's visits would not be in a therapeutic setting, which the attorney noted were not even working. Father's attorney countered that the reports showed the therapeutic visits seemed to go well and father looked to the counselor for guidance when Li.P. questioned him and immediately put that guidance into action. His attorney stated father had an issue with group sessions because he continued to deny the allegations.

The juvenile court granted the request to give father weekly visits, with two in person and two via video, which could be reassessed later, noting it did not hold his denial of the sexual abuse allegations against him given the lengthy criminal statute of limitations. The juvenile court set a 30-day review hearing for March 5, as it was concerned about mother's ability to protect the children from father and to parent all three

9.

children, and a continued review hearing for May 3, finding extraordinary circumstances to continue services due to the pandemic and the children's serious behavioral issues.

***The Agency's Section 388 Petition***

The Agency filed a section 388 petition on February 23 seeking modification of the orders continuing mother's reunification services and granting father visitation to orders terminating her services, providing her with monthly visits, and amending father's visits to once per month. As changed circumstances, the Agency alleged it terminated mother's trial visit with M.P. on February 17 due to safety concerns raised by various service providers and because mother had not engaged in services at Sierra Vista since December 2020. The Agency asserted it would be in the children's best interests to amend father's visits as he had not "shown progression with visit[s]," and it would be in their best interests to terminate mother's services so they could have permanency, as L.P. had been with his current care providers, who were committed to adopting him, since November 2019, and M.P. was placed in a concurrent placement on February 17.

The Agency filed a report in support of the petition in which it recommended the juvenile court terminate mother's reunification services, reduce father's visitation to once per month, and set a section 366.26 hearing. While L.P. and M.P. were in concurrent placements, Li.P. was in a foster home that was not a concurrent home. The Agency stated that while mother had been making progress and demonstrated she was ready for the trial visit with M.P., the trial visit ended because mother was unable to safely care for and parent her. Shortly thereafter, M.P. was found to have bruising on her legs and an abscess on her foot and the social worker learned mother had been putting M.P. in the closet with the lights off as a form of punishment.

A contested evidentiary hearing on the section 388 petition was held on April 30, which mother, but not father, attended. A relative had come forward seeking placement in Kansas, so the juvenile court ordered that the Agency could initiate an Interstate Compact on the Placement of Children (ICPC) with Kansas. Testimony was received

10.

from the social worker and mother. As related to father's visits, his attorney argued the observation logs did not show a lack of progress but rather showed that visits were good, and father had appropriate parenting skills. His attorney further argued father had made ongoing efforts to maintain a relationship with his children and there was nothing in the record to indicate it would be appropriate to reduce the children's contact with him when everything showed they were benefiting from it.

The juvenile court granted the section 388 petition, finding there was a significant change of circumstances in that the trial visit did not work and there was no evidence mother could properly care for all three children and granting the petition would be in the children's best interests. The juvenile court terminated mother's reunification services, found reasonable services were offered or provided to mother, and set a section 366.26 hearing for August 26. The juvenile court reduced father's supervised visits to a minimum of one per month and mother's supervised visits to twice per month.[4]

***The Section 366.26 Hearing***

In a report for the section 366.26 hearing, the Agency recommended (1) terminating parental rights over now eight-year-old L.P. and four-year-old M.P. and establishing a permanent plan of adoption with their current care providers, and (2) continuing six-year-old Li.P. as a dependent and establishing another planned living arrangement.

Both L.P.'s and M.P.'s caregivers wanted to adopt them. Li.P. was receiving "TBS services" in the home four days a week for at least an hour a day with several clinicians and support persons. She was taking psychotropic medication; she reported they were making her feel better and calmer. Li.P. was in her sixth placement—she was placed with her current care provider on March 4—and she was adjusting very well to the

---

**4** Mother filed a writ petition challenging the failure to return the children to her and the termination of her reunification services, which we denied. (*Alexis M. v. Superior Court* (Aug. 16, 2021, F082750) [nonpub. opn.].)

home. She still struggled with behaviors and appropriate boundaries, but with her medications and the care provider's calm manners she was starting to improve. Li.P. had bonded well with her care provider and expressed how much she liked the home. The ICPC with Li.P.'s paternal grandparents fell through, as they decided not to continue in the process. While Li.P.'s care provider was not interested in legal guardianship or adoption, she was open to providing Li.P. with long-term foster care.

The social worker reported that while father had been consistent with his visits, he had not been consistent in completing services. He was dismissed from Parent's United for missing groups after his daughter started confronting him about the abuse she experienced and asked him why, and he struggled with taking accountability. Father had supervised visits with the children five times in April, and after his visits were reduced to monthly one-hour visits, he visited once in May, June, and July.

The visitation logs showed that two Zoom visits, on April 2 and 16, were short, with L.P. attending the first for a half hour and the second for 15 minutes. In the first visit, Li.P. made pouty faces and refused to talk and became upset when the family spoke to her brother. In the second, Li.P. left because she wanted to eat. The visitation supervisor noted during these visits, father's conversation was appropriate and his parenting skills good.

Father had in-person visits with the children on April 9 and 23. At each visit the children were happy to see father. At the April 9 visit, father was highly interactive with the children. He and Li.P. worked on a puzzle together. She had a tantrum toward the end of the visit because she wanted to play with the phone, but she stopped and hugged father when the visit ended. At the April 23 visit, Li.P. and L.P. were excited to see father and hugged him. Father brought age-appropriate activities for the children and engaged in pretend play with them, but he displayed inconsistent parenting skills and did not redirect Li.P. appropriately. Li.P. frequently misbehaved throughout the visit—she

kicked father and her brother, pouted, threw herself on the floor and banged her head on the couch several times. Li.P. did not listen to father or the visitation supervisor.

A Zoom visit with the three children on April 30 ended abruptly after about four minutes. While Li.P. was excited to see father, once the family briefly exchanged initial greetings, she told father they were going to play a game and he needed to say yes to everything for the rest of the visit. Li.P., who appeared angry and frustrated, told father she wanted revenge on him "for making me touch your private." When no one responded, Li.P. repeated that she wanted revenge and why. The visitation supervisor put everyone in waiting rooms so she could talk to Li.P. alone. When the supervisor told Li.P. it was best not to continue the visit, Li.P. appeared sad and said "No!" She told the supervisor, "I miss him. I was crying in my room upstairs today," and while she knew he was "Bad," "I still like him, though," and she just wanted revenge on him. The supervisor ended the Zoom visit with Li.P. but intended to continue it with the other children. Father, however, had left the visit and made no attempt to contact the visitation center.

Father's next visit on May 14 was an in-person visit with all three children. Li.P. often had angry outbursts that appeared provoked by small things. The children bickered with and hit each other, and they snatched items from one another. The supervisor described the visit as near constant chaos. Li.P. screamed and kicked the couch, yelled at M.P., hit her siblings, and slapped and pulled at L.P.'s face, but father did not correct Li.P. It appears this was father's last visit with Li.P. before the section 366.26 hearing. Li.P.'s foster parent forgot to bring her to the June visit and although father was told he could schedule a make-up visit, he evidently did not do so. While the visitation report lists all three children's names as being present at the July visit, the visitation notes do not mention Li.P.

With respect to Li.P., the Agency recommended, among other things, that the juvenile court find visits between Li.P. and mother and father are "detrimental and should

13.

be suspended pending the next review hearing." The Agency did not explain the basis for its recommendation.

Neither parent was present at the August 26 section 366.26 hearing. Mother's attorney asked for a contested hearing as to L.P. and M.P. but was ready to proceed as to Li.P. Father's attorney had no comment. The juvenile court approved and adopted the findings and recommendations contained in the report with respect to Li.P., set a review hearing in her case for February 18, 2022, and set a contested section 366.26 hearing as to the other two children for September 10.

The parents did not appear at the September 10 hearing. Mother's attorney proceeded by argument only, asking the juvenile court not to terminate mother's parental rights because she had a relationship with M.P. and L.P., she felt a strong bond with them, and she believed they were bonded to each other. Father's attorney, who noted father was currently in Kansas, had no comment or argument. The juvenile court declined to apply the beneficial parent-child relationship exception to adoption and ordered adoption as L.P.'s and M.P.'s permanent plans, as there was clear and convincing evidence L.P. and M.P. would be adopted and there was no evidence termination of parental rights would be detrimental.

Father filed a notice of appeal which stated he was appealing the August 26 order terminating his parental rights to M.P., L.P. and Li.P. Father subsequently filed an amended notice of appeal stating he was appealing the September 10 order terminating his parental rights to L.P. and M.P., and the August 26 order setting a permanent plan of long-term foster care for Li.P.

## DISCUSSION

Father contends the juvenile court abused its discretion when it found visits with Li.P. would be detrimental and suspended them.

As a threshold issue, we address the Agency's contention the visitation order is not reviewable because the original notice of appeal does not mention the visitation order and

14.

the amended notice of appeal, which includes the visitation order, is untimely as to that order.

Father filed his original notice of appeal on September 30, which stated he was appealing from the findings and orders of the court made on August 26 terminating his parental rights to M.P., L.P. and Li.P. Under the "order appealed from" section of the form, father marked the box next to section 366.26 (termination of parental rights). Father's amended notice of appeal, filed on November 1, stated he was appealing the September 10 order terminating his parental rights to L.P. and M.P., and the August 26 order setting a permanent plan of long-term foster care for Li.P. Under the "order appealed from" section of the form, father marked the boxes next to section 366.26, termination of parental rights and planned permanent living arrangement, and again listed the two hearing dates.

Filing a notice of appeal vests jurisdiction in the appellate court and terminates the jurisdiction of the lower court. (*Hollister Convalescent Hospital, Inc. v. Rico* (1975) 15 Cal.3d 660, 666.) A timely and proper notice of appeal is essential to vest the reviewing court with appellate jurisdiction. (*Associated Lumber & Box Co. v. Superior Court* (1947) 79 Cal.App.2d 577, 581.) Under California Rules of Court, rule 8.405(a)(2),[5] the appellant must file a notice of appeal signed by either the appellant or his or her attorney. (*In re Malcolm D.* (1996) 42 Cal.App.4th 904, 909.) A notice of appeal is to be liberally construed in favor of its sufficiency. (Rule 8.405(a)(3); *In re Daniel Z.* (1992) 10 Cal.App.4th 1009, 1017.) Rule 8.405(a)(3) provides: "The notice of appeal must be liberally construed, and is sufficient if it identifies the particular judgment or order being appealed…." (See *D'Avola v. Anderson* (1996) 47 Cal.App.4th 358, 361.)

Here, in accordance with the rule that a notice of appeal is to be liberally construed in favor of its sufficiency, we construe father's original notice of appeal as being from the

---

[5] All rule references are to the California Rules of Court.

appealable written orders filed on August 26 to include the visitation order. (*In re Daniel Z.*, *supra*, 10 Cal.App.4th at p. 1017.) Liberal construction is particularly appropriate here because father indicated in his notice of appeal that he was appealing from the "findings and orders" of August 26. We shall therefore construe the notice of appeal as properly specifying the visitation order that was made at the August 26 hearing.

Turning to the visitation order, even after the juvenile court terminates reunification services and places a child in long-term foster care, it is required to make an order for parental visitation unless it "finds by a preponderance of the evidence that the visitation would be detrimental to the physical or emotional well-being of the child." (§§ 366.26, subd. (c)(4)(C); 366.22, subd. (a)(3).) " 'Detriment is a familiar standard in child welfare determinations; but, as several courts have acknowledged, the notion of detriment is at best a nebulous standard that depends on the context of the inquiry…. It cannot mean merely that the parent in question is less than ideal…. Rather, the risk of detriment must be *substantial*, such that [father's continued visitation] represents some danger to the child's physical or emotional well-being.' " (*In re A.J.* (2015) 239 Cal.App.4th 154, 160.)

While a visitation order is reviewed pursuant to a deferential "abuse of discretion" standard (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067), we review the juvenile court's finding that visitation would be detrimental for substantial evidence. (*In re A.J.*, *supra*, 239 Cal.App.4th at p. 160; *In re Michael R.* (1998) 67 Cal.App.4th 150, 156.) As such, we look for "evidence that is reasonable, credible and of solid value." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1401.) "[W]e consider the evidence favorably to the prevailing party and resolve all conflicts in support of the [juvenile] court's order." (*Ibid.*)

Father first urges us to reverse the visitation order because the juvenile court did not specify, either orally or when it adopted the Agency's proposed finding, that it was making the detriment finding by a preponderance of the evidence or that it found ongoing

16.

visits would be detrimental to Li.P.'s physical or emotional well-being. Father asserts we cannot imply the correct standard of proof where the record fails to demonstrate the juvenile court considered both questions. Father's argument effectively is that we must presume the juvenile court overlooked the statutory requirements for a detriment finding because the court did not expressly state it made the finding in conformity with the statute.

But that approach turns the appellate review process on its head. We do not presume the court got it wrong unless proven otherwise. We instead presume the court's judgment is correct. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 ["A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness."].) As one court has said under similar circumstances, "[i]n light of the … court's failure to articulate an incorrect standard, [appellant's] failure to request clarification of the record below, and the presumption the … court applied the correct statutory standard of proof, this issue fails for want of a record which affirmatively demonstrates error." (*Armando D. v. Superior Court* (1999) 71 Cal.App.4th 1011, 1025; see *In re Angelia P.* (1981) 28 Cal.3d 908, 927 [juvenile court appropriately terminated the parties' parental rights under the clear and convincing evidence standard, even though the court "did not expressly articulate its use of the appropriate standard of proof"]; *Cueto v. Dozier* (2015) 241 Cal.App.4th 550, 561 ["Absent any evidence to the contrary, we presume that the trial court applied the correct legal standard."].)

Here, there is nothing in the record to suggest the juvenile court articulated the incorrect standard and father did not request clarification of the juvenile court's detriment finding. Accordingly, we presume the juvenile court used the correct standard.[6]

---

[6] Father contends the Agency has conceded he is correct, thereby requiring reversal, because the Agency does not address this issue in the respondent's brief. Contrary to father's contention, the Agency's failure to address contentions made in father's opening

17.

As for evidence of detriment, the record shows Li.P. had significant behavioral and emotional problems. She told the social worker she was angry because of what father had done to her. Therapeutic supervised visits were ordered with father toward the beginning of the case because Li.P. was exhibiting sexualized and aggressive behaviors after visits with both parents, and she told staff she wanted to kill herself when she saw them. When therapeutic visits occurred, they went well—Li.P. seemed comfortable with father and he acted appropriately, and although Li.P. asked him about his abuse of her, father did as the therapists instructed; he at first redirected Li.P. and later confirmed the behavior she accused him of was not okay.

When therapeutic visits were suspended in March 2020, father was allowed to visit Li.P. along with her siblings in a supervised, though not therapeutic, setting. The initial group visits did not go well as Li.P. was either not interested in participating and left the Zoom visits early or raised the issue of father abusing her in front of her siblings. For example, at one June 2020 visit, Li.P. told father she wanted him "at [her] house now," but "[j]ust don't do what you asked me to[] because it made me feel uncomfortable," and departed the video visit within minutes. At another video visit that same month, she told father she missed him at her "real house. I really wish you wouldn't have done that."

While father received therapeutic visits from October 2020 to March, the visits ended when father's reunification services were terminated in February and Li.P. again

brief does not concede those contentions or otherwise indicate they have merit. (*People v Hill* (1992) 3 Cal.4th 959, 995, fn. 3 [a respondent's failure to respond to an appellant's argument does not necessarily constitute a concession], overruled on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; *Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 227, fn. 9 ["a respondent does not concede contentions asserted in an appellant's opening brief by failing to address them"].) We presume the juvenile court's order is correct and it is incumbent on father, as the appellant, to affirmatively establish error. (*Rossiter v. Benoit* (1979) 88 Cal.App.3d 706, 712.)

joined the family visits and continued to confront father about the abuse. Her questions became more forceful at the April 30 Zoom visit, when she told father she wanted revenge for what he did to her. Father did not know how to deal with this development. The visitation supervisor diffused the situation by placing the parties in waiting rooms and speaking with Li.P., who expressed her conflicted feelings about father—she knew he was "[b]ad," but she still liked and missed him. Father left the visit before he could find out what Li.P. had to say. At the next visit, which was in person, Li.P. was out of control with little direct interaction with father.

From this evidence, the juvenile court reasonably could find that Li.P.'s visits with father outside the therapeutic setting negatively impacted Li.P. emotionally. Father's approach to Li.P.'s accusations was to avoid them; despite being told to validate Li.P.'s claims, he had no response when she said she wanted revenge on him. Rather than waiting to learn the outcome of the supervisor's conversation with Li.P. or continue visiting with the other children, father avoided the issue by disconnecting and making no attempt to rejoin the visit. Although Li.P. loved and missed her father, her relationship with him was complicated by her belief that he was responsible for her sexual abuse. Until her conflicting feelings were resolved, visits could not occur that would be beneficial to her, as they would simply remind her that father is unwilling to validate her feelings. As Li.P.'s therapist said, Li.P.'s out-of-control behavior in the resource home stemmed from her wanting acknowledgement and validation from father.

Once a parent's reunification services are terminated, it is unlikely that a dependent child will be returned to the parent's custody. That was true in this case, since father had not made any genuine attempt to complete any of the necessary services to regain custody of his children. For this reason, the focus of the dependency proceedings following termination of reunification services was on helping Li.P. stabilize so she could find a permanent home. The juvenile court reasonably could conclude continued visits with father, who had learned little about helping Li.P. process her abuse, outside a

19.

therapeutic setting, would only serve to destabilize Li.P. and prevent her from achieving permanency.

## **<u>DISPOSITION</u>**

The juvenile court's orders suspending father's visits with Li.P. and terminating his parental rights to L.P. and M.P. are affirmed.